**HUSKY OIL COMPANY,**
Plaintiff-Appellee,
v.
**DEPARTMENT OF ENERGY and James R. Schlesinger, Secretary of Energy,**
Defendants-Appellants.
No. 10–18.

Temporary Emergency Court of Appeals.

Argued July 10, 1978.

Decided Aug. 10, 1978.

Nancy C. Crisman, Dept. of Energy, Washington, D. C., with whom Robert G. Heiss and C. Lee Allen, Office of Gen. Counsel, Reg. Lit. Div., Dept. of Energy, Washington, D. C., were on the brief for defendants-appellants.

David H. Lloyd, Arnold & Porter, Washington, D. C., with whom Jeffrey A. Burt and Michael T. Scott, Washington, D. C., of the same firm, and Karl F. Anuta, Denver, Colo., of counsel, were on the brief for plaintiff-appellee.

Before INGRAHAM, ESTES, and ZIRPOLI, Judges.

ESTES, Judge.

The Federal Energy Administration[1] promulgated the Old Oil Allocation Program, or Entitlements Program, 10 CFR § 211.67, in order to correct disparities in the allocation and pricing of lower tier oil caused by the domestic crude oil two-tier pricing system originally established by the Cost of Living Council as part of Phase IV of the Economic Stabilization Program, held valid and explained by this court in *Consumers Union v. Sawhill*,[2] 525 F.2d 1068, 1074–1077 (1975). The Entitlements Program[3] requires refiners who run a greater percentage of lower tier price controlled crude than the national average to purchase entitlements from those refiners who run a smaller percentage than the national average, thereby equalizing the cost of crude oil for all refiners. Entitlement obligations are determined monthly on the basis of the national old oil ratio (the national average of lower tier crude processed or run by refiners), the lower tier equivalent of upper tier uncontrolled crude, and the value of one entitlement (the difference between the weighted average cost to refiners of lower tier crude and the weighted average cost of

---

1. Pursuant to the Department of Energy Organization Act (DOE Act), Public Law 95–91, August 4, 1977, 42 U.S.C. § 7251 n., and Executive Order No. 12009, 42 Federal Register 46267, September 15, 1977, the Department of Energy (DOE) assumed the duties and functions of the FEA.

2. Quoted in *Mapco, Inc. v. Carter*, 573 F.2d 1268, 1273–4 (Em.App.1978), cert. denied, —— U.S. ——, 98 S.Ct. 3090, 57 L.Ed.2d 1134 (1978).

3. For a more detailed discussion of the Entitlements Program, see *Pasco, Inc. v. FEA*, 525 F.2d 1391 (Em.App.1975), *Cities Service Co. v. FEA*, 529 F.2d 1016 (Em.App.1975), cert. denied, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976), 10 CFR § 211.67, and 39 Fed.Reg. 42,246 (December 4, 1974).

upper tier uncontrolled crudes[4] less an offset for a per barrel import fee). The small refiner bias, if any is available, operates as an additional runs-to-stills credit. As this court explained in *Cities Service Co. v. F.E.A.*, 529 F.2d 1016, 1021 (Em.App.1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976):

> The Entitlements Program essentially requires petroleum refiners to shift their over-all reliance on controlled or uncontrolled oil to a more balanced position among all the refiners. A refiner must, under the Entitlements Program, have one entitlement for each barrel of old oil which it refines during any month. The FEA issues a certain number of entitlements to each refiner each month, based on that refiner's proportionate share of all old oil refined on a nation-wide basis, adjusted somewhat by the small refiner bias.[9] The program thus commenced on

[9] The small refiner bias provides additional entitlements to small refiners in an amount based on a designated percentage of each small refiner's average daily volume of crude oil runs to stills. 39 F.R. 42,246 (Dec. 4, 1974).

> the premise that all refiners should be including an equal proportionate share of price-controlled oil in their refinery runs each month.

Entitlement purchase obligations are imposed on a refinery when, on the basis of information supplied to the FEA, it has been determined that the refiner was running more old oil as a percentage of its total crude oil refinery runs than the national average and consequently does not have sufficient entitlements for all of the old oil it has refined during that month. Those refiners with less old oil in their refinery runs than the national average would receive more entitlements than necessary for compliance, which they may sell to those refiners which have purchase obligations under the regulations. Thus,

> [b]y requiring refiners and importers who sell entitlements to reduce their crude oil or product costs by the amount of the entitlement sales pro-

ceeds, and allowing a purchaser of entitlements to include the cost of entitlements in its crude oil costs, the FEA basically equalized the average weighted crude oil costs of all refiners, thereby eliminating the inequities caused by the "two-tier" pricing system.

*Pasco, Inc. v. FEA*, 525 F.2d 1391 at 1395 (Em.App.1975) . . . . .

These entitlements purchases created a substantial financial burden for those small refiners which had greater than average access to old oil but were unable to recover these increased costs in the market place. Such a result was contrary to one of the goals enumerated in the Emergency Petroleum Allocation Act, as amended (EPAA), which called for regulations to "restore and foster competition in the producing, refining, . . . and to preserve the competitive viability of independent [and] small refiners." 15 U.S.C. § 753(b)(1)(D); see *Mapco Inc. v. Carter*, 573 F.2d 1268 (Em. App.1978). In *Mobil Oil Corp. v. FEA*, 566 F.2d 87, 96 n.19 (Em.App.1977), this court observed that:

> Congress was particularly concerned about the small and independent refiners. Congress recognized that these "enterprises have an importance to the United States economy far out of proportion to their market shares, because they continually spur the major integrated firms to improve their own efficiency in the production, refining, transportation and marketing of products."

Quoting H.R. Report No. 531, 93d Cong., 1st Sess. (1973), U.S.Code Cong. & Admin.News 1973, pp. 2582, 2595. See, § 504(a) DOE Act, which provides for

> adjustments to any rule, regulation or order described in § 501(a) issued under the Federal Energy Administration Act, the Emergency Petroleum Allocation Act of 1973, the Energy Supply and Environmental Coordination Act of 1974, or the Energy Policy and Conservation Act, consistent with the other purposes of the relevant act, *as may be necessary to prevent special hardship, inequity, or unfair*

4. Which include imported crude, North Slope crude, stripper crude, and Naval Reserve crude.

*distribution of burdens,* and shall by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, or recission [sic] of, *exception to, or exception from, such rule, regulation, or order.* (emphasis added)

See also, § 7(b), Federal Energy Administration Act of 1974, 15 U.S.C. § 766(b), which provides for such adjustments "as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens . . . ."

The DOE's exception process, which *Pasco v. FEA,* 525 F.2d 1391 (Em.App.1975), found to afford small refiners sufficient protection to justify their inclusion in the Entitlements Program, provides for relief for small refiners when the regulations would cause "serious hardship or gross inequity." 10 CFR § 205.50(a)(1). The standard by which the agency evaluates applications of small refiners for exception relief from the Entitlements Program provides that:

> Exception relief from the purchase requirements of the entitlements program will generally be granted to small refiners if the application of the program's requirements would otherwise prevent the firm from achieving the lesser of its historic profit margin or its historic return on invested capital . . . *Delta Refining Company,* 2 FEA ¶ 83,275 at 83,883 (9–11–75) (hereafter referred to as *Delta* )

The historical profit margin is the arithmetic average of the profit margins achieved in each of the seven fiscal years which preceded the inception of the Entitlements Program. *Delta, supra,* at 83,880. The historical return on invested capital is the arithmetic average of the return on invested capital realized during the best four of these seven fiscal years. *Delta, supra,* at 83,881. These historical figures are computed on the basis of data from a firm's refining and marketing operations only, as the FEA took the position that inclusion of production data would tend to "distort the financial position of the refin-

ing and marketing operations and serve as a disincentive to the expansion of production activities," 40 Fed.Reg. 33490 (August 8, 1975), *Delta, supra,* at 83,882, in the case of the "relatively few small refiners who are also involved in crude oil production." *Delta, supra,* at 83,882. The Department of Energy will not grant exception relief which exceeds the value of the firm's net prospective entitlement purchase obligation. *Beacon Oil Co.,* 3 FEA ¶ 83,209 (June 8, 1976).

In *Delta, supra,* at 83,881, the FEA indicated that it would "take into account unusual circumstances" in determining the appropriate extent of relief. This position reaffirms earlier agency statements that

> [W]here unusual factors exist, the FEA has on a case-by-case basis determined that a shorter period of time than seven fiscal years should be used, or that a weighted rather than an arithmetic average should be calculated in order to arrive at a fair and reasonable determination of a firm's historic financial and operating posture. *OKC Corporation,* 2 FEA ¶ 80,604, 80,852 (6–5–75), citing, *inter alia, Farmariss Oil Corp.,* 2 FEA ¶ 83,080 (3–28–75), and *Navajo Refining Company,* 2 FEA ¶ 80,581 (5–2–75) [both refining operations which received measures of relief due to the substantial increases in their refining capacities at some time during the seven-year period before 1974].

Any denial of exception relief by the agency may be appealed under 10 CFR § 205.100. The appellant must be a person aggrieved by agency action and must establish that the agency's action was "erroneous in fact or in law" or "arbitrary or capricious." 10 CFR § 205.106(b)(2). The denial of an appeal is a final agency action and is, therefore, subject to judicial review. The FEA Decision and Order of June 2, 1977, denying Husky Oil Company's (Husky) appeal of the Decision and Order of December 15, 1976, is the subject of this litigation.

The FEA Decision and Order of December 15, 1976, granted exception relief to Husky for the period December, 1976 to

May, 1977 because under the *Delta* standard, Husky had an average historical profit margin of —1.47%, an average historical return on invested capital of 1.24%, and current figures of —5.88% and —5.84%, respectively, and thus could not attain the lesser of its historical profit margin or return on invested capital if obligated to purchase entitlements. The agency excluded data from the fiscal years 1968 through 1970, because it considered these years to be unrepresentative of the company's historical financial and operating posture.[5] Administrative Record (AR) 62–64.

Because the relief granted in the order of December 15, 1976 was conditional to the extent that it would be re-evaluated by the DOE based upon actual financial data submitted at the close of the 1977 fiscal year, Husky appealed to avoid being precluded from challenging the agency's literal application of the *Delta* standards for 1977 should the actual data show an operating profit. Husky was not contesting the relief granted but rather the bases for such relief:

> In no other case has the FEA ever analyzed whether relief should be granted under the entitlements program by using *Delta* standards which result in a *negative* profit margin ceiling (emphasis in original). AR 71.

Husky's administrative appeal was denied by order of June 2, 1977, on the grounds that the company as a whole operated at a profit and that the losses reflected in the

data for the refining and marketing operations were the result of Husky's choice of accounting methods. AR 248–249. The FEA noted that "a portion of a firm may report losses for a period of time while the over-all business enterprise is nevertheless a very viable operation," AR 249, and in conclusion stated that:

> [T]he FEA's use of a negative historical profit margin does not in any way require Husky to maintain an operating loss posture or prevent the firm from achieving a positive profit margin if it is able to do so while still meeting its legal obligations under [the Entitlements Program] . . . . [T]he use of any other profit margin could well result in an arbitrary determination that places Husky in a more favorable position than other firms in qualifying for exception relief. AR 250.

After dismissal of its "Request for Supplemental Order, Correction, and/or Modification or Recision," AR 251–266, of the order of June 2, 1977, in order to reopen the proceedings and clarify the record regarding "clear factual errors and erroneous assumptions," AR 252, Husky filed a complaint in the United States District Court in Wyoming, on September 28, 1977, seeking an order setting aside the decision of June 2, 1977, and reopening the administrative proceedings in order to "process Husky's request for exception relief consistent with the FEA's administrative rules and determinations in granting exception relief to

---

5. In its Decision and Order of March 28, 1975, granting exception relief to Husky during April, May and June, 1975, the FEA indicated that an arithmetic profit margin for fiscal years 1971–74 should be used as representative of Husky's historical financial and operating posture, since Husky's profit during 1968–70 was "diminished by the substantial cost involved in the modernization of an old refinery." AR 179. Husky was granted 100% exception relief

> [i]n view of the fact that the prospective impact of the Entitlements Program upon Husky is of sufficient magnitude as to seriously affect the firm's competitive position and its proposed expansion program, a serious hardship exists and exception relief is warranted. AR 179.

This decision was based on the consideration of Husky's production as well as refining and marketing data as it pre-dated the *Delta Refin-*

*ing Company* decision of September 11, 1975, at 2 FEA 83,275, which later became the *Delta* standard.

On July 9, 1975, Husky was granted an extension of its exception relief for July 1 through August 31, 1975, because the conditions on which the order of March 28, 1975 were based continued to exist. Husky did not again receive exception relief until June 21, 1976, at which time the agency granted 100% exception relief for the months of June through November, 1976, after evaluating Husky's refining and marketing data under the *Delta* standard. According to the agency, Husky would be unable to achieve its average historical profit margin of 2.48% for the fiscal year 1968 to 1974 or its average historical return on invested capital of 1.69% because its current figures were —1.87% and 1.27%, respectively. AR 194–203.

small refiners under the Entitlements Program." Record (R) 21. On December 20, 1977, argument was heard on the parties' cross-motions for summary judgment; and on March 13, 1978, the District Court granted plaintiff Husky Oil Company's motion for summary judgment and ordered the defendant, the DOE, to "reopen plaintiff's request for exception relief and to permit such relief as is necessary to enable the plaintiff to maintain the competitive viability of its refining and marketing operations . . . ," to exempt Husky from any additional entitlement purchases pending determination of relief, and to allow "plaintiff to sell sufficient entitlements to recover and recoup entitlement expenditures made by plaintiff in December, 1977 . . . ." R. 476. The court further ordered the parties to disregard the DOE's proposed decisions of December 2, 1977 and December 20, 1977. The proposed order of December 2, 1977 sought to modify the order of April 19, 1977, reviewing the appropriateness of Husky's 1976 exception relief by requiring Husky to refund $840,768.36 in excess entitlements relief and to correct *Delta* computations to reflect only refining and marketing data for the years 1968–1974, so that Husky's historical profit margin would be —2.29%. (There is no mention of an adjustment to the historical return on invested capital.) R. 513–521. The proposed order of December 20, 1977, sought to deny Husky exception relief during October, November, and December, the remaining months of its 1977 fiscal year, since its return on invested capital would be 6.10%, which is well above its historical figure of 1.24%, although its profit margin would be —1.61%. However, the order did grant relief subject to later review for March through May, 1978, on the basis of a current profit margin of —11.49% and a current return on invested capital of —10.69%. R. 258–281. The appellant DOE uses these proposed orders to support the validity of the Decision and Order of June 2, 1977. Appellant's Brief 7, 8, 15, 20 and Appellant's Reply Brief, 3–4.

The Department of Energy challenges the decision of the district court, presenting the issues as whether:

A. The District Court Erred in Holding That the EPAA Requires DOE to Award Exception Relief to Enable Husky to Maintain the Competitive Viability of Its Refining and Marketing Operations, Despite Husky's Failure to Qualify Under the *Delta* Standard.

B. The District Court Erred in Holding That *Delta* Fails to Protect a Firm with a Negative Historical Profit Margin from Suffering Serious Hardship or Gross Inequity.

C. The District Court Erred in Holding That Husky Demonstrated Compelling Circumstances Requiring the Use of a Standard Other than *Delta*.

D. The District Court Erred in Its Determination That the Final Agency Order of June 2, 1977 Was Arbitrary and Capricious Because It Was Purportedly Based on Consideration of Husky's Crude Oil Production Activities and Speculations Regarding Husky's Accounting Methods.

Appellant's Brief, ii.

The appellee, Husky, states the issues on appeal as whether:

A. The District Court Properly Held that Conditioning Husky's Exception Relief on Maintenance of a Negative Profit Margin Was Arbitrary, Capricious and Grossly Discriminatory Vis-A-Vis Other Small Refiners.

B. The District Court Correctly Found that DOE's Decision, Being Founded on Erroneous Speculation, Was Therefore Not Supported by Substantial Evidence.

C. The District Court Correctly Found that DOE Violated Its Own Rules by Considering Husky's Crude Oil Production Profits as a Source of Funds to Offset the Losses Which DOE Decreed for Husky's Refining and Marketing Operations.

Appellee's Brief, iv.

The District Court ordered that the DOE "permit such relief as is necessary to enable

**650**

[Husky] to maintain the competitive viability of its refining and marketing operations . . ." R. 476. A major congressional concern has been the preservation of the "competitive viability of independent refiners, [and] small refiners." 15 U.S.C. § 753(b)(1)(D); *Mobil Oil Corporation v. FEA, supra*; *Pasco v. FEA, supra*. The fact that some small refiners, including Husky,[6] are also producers, see Conference Report on the EPAA, 2 CCH Energy Management ¶ 10,610, had no bearing on Congress' intent to "protect" the class as a whole vis-à-vis the major refiners. *Pasco v. FEA, supra*, at 1400.

While the statutory and regulatory objective of competitive viability is not to be elevated to the level of a mandatory duty, the balancing of all nine of the objectives listed in § 4 of the EPAA is required to be attained "to the maximum extent practicable." This includes the objective in § 4(b)(1)(F), mandating the "equitable distribution of crude oil . . . at equitable prices among all sectors of the petroleum industry including . . . small refiners." *Pasco, supra*, at 1397.[7]

The *Delta* standard determines a firm's financial and operating posture on the basis of its refining and marketing data alone. Excluding its 1975 exception relief, which antedated the *Delta* decision, all of Husky's exception relief has been granted under the terms of *Delta*, with a showing of serious hardship or gross inequity. 10 CFR § 205.50(a)(1). Prior to the appeal order of June 2, 1977, Husky's production activities had not been mentioned in the consideration of its relief under *Delta*, since that standard generally excludes this data for the "relatively few small refiners who are also involved in crude oil production." *Delta, supra*, at 83,882. In its order of June 2, 1977, DOE explained its refusal to grant relief in the form of an adjusted historical profit margin and return on invested capital by stating that:

> (C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;
>
> *   *   *   *   *   *
>
> (E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;
>
> *   *   *   *   *   *
>
> (G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;
>
> (H) economic efficiency; and
>
> (I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

See also, *Atlantic Richfield Co. v. FEA*, 556 F.2d 542, 545 n.8 (Em.App.1977):

> The Emergency Petroleum Allocation Act of 1973, later amended and extended by the Energy Policy and Conservation Act of 1975, was enacted by Congress in response to its finding that shortages of crude oil, residual fuel oil, and refined petroleum products existed or were imminent. The Act required the President to promulgate regulations providing for mandatory allocations in amounts and at prices specified in such regulations to achieve to the maximum extent practicable [the] nine broad objectives . . .

---

6.  Husky stated in its administrative "Request for Supplemental Order, Correction, and/or Modification or Recision" that:

    It should be noted that the FEA recognized in its Decision, Husky is a "*small and independent* refiner as those terms are defined in 10 CFR 211.62," p. 1. (Emphasis added by Husky). As a consequence, Husky obtained during the base years less than 30% of its refinery input of domestic crude oil from affiliated entities. More than 70% of its crude was supplied in arm's length transactions at the posted prices of crude. AR 257.

7.  See *Pasco, supra*, at 1397 n.14, where this court listed the seven other objectives of the EPAA.

[14] In addition to the objectives of subsection (D) and (F) of section 4(b)(1) of the Allocation Act, Congress also indicated that the regulation allocating crude oil under the mandate of section 4(a) should provide "to the maximum extent practicable," for:

(A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

Husky has chosen to utilize accounting methods during the 1968–1973 period which yielded a reported pre-tax profit for Husky's combined crude oil production, refining and marketing operations, while using pre-tax losses for its petroleum refining and marketing operations. AR 249.

Husky was, therefore, denied the requested adjustments with respect to its historical refining and marketing data because its production division was operating on a profitable basis.[8] It is "of paramount importance that the agency adhere to its own announced rules," *Delta Refining Company v. FEA*, 559 F.2d 1190, 1199 (Em.App.1977), yet DOE departed from the *Delta* standard when it evaluated Husky's refining and marketing data in light of its production activities. The agency's inclusion of such information in the case of Husky, a producer-small refiner, was contrary to its stated policy of avoiding "disincentives to the expansion of production activities." *Delta, supra,* at 83,882.

DOE argues that the *Delta* standard is a rule which must be applied "uniformly among all small refiners . . .," Appellant's Brief 11, and that "[m]odification of the *Delta* standard for Husky would work an obvious discrimination against the other members of Husky's class." Appellant's Brief 3. However, in its notice of intention to modify the standards for exception relief (which came to be known as the *Delta* standard), published at 40 Fed.Reg. 33490 (August 8, 1975), the FEA recognized that in some cases literal or strict application of the *Delta* criteria would not provide adequate relief:

. . . The firm established that strict application of these criteria would not alleviate a serious hardship or gross inequity suffered by the firm as a result of the entitlements program. Thus, for example, in those instances in which extraordinary financial difficulties are still present as a result of factors such as insufficient cash flow from operations during the current period or if there is a lack of historical operating data or other unusual circumstances, appropriate adjustments would be made in the exception relief extended.

The FEA Office of Exceptions and Appeals guidelines indicate that a literal application of the *Delta* standard is not the sole basis on which exception relief is granted:

It should be recognized . . . that each exception application . . . must be considered on the basis of the particular factual circumstances presented in the application, and that the broad, general standards set forth in these guidelines represent only a starting point for the consideration of a particular application. 5 CCH Energy Management ¶ 80,003 at 80,008.

Husky presents the "unusual circumstance" of being the only small refiner out of 36 in the United States with a negative profit margin for its historical period. R. 468, Appellant's Brief 21. In granting Husky's original application for exception relief on March 28, 1975, the FEA

determined that a simple restoration of the firm to its historical financial and operating posture over the last six years would be inappropriate because in the years 1968, 1969, and 1970 Husky's historical profitability was diminished by the substantial cost involved in the modernization of an old refinery. R. 179.

The district court found that Husky's losses during the years 1968 through 1973 were attributable to its "acquisition of the refining and marketing facilities of a failing company, Frontier Refining Company, as well as extraordinary capital expenditures for refinery expansion, refinery operation, and the production and refining of non-leaded gas and wax crude."[9] R. 462–463.

---

8. See R. 316–319 where counsel for DOE argues that Husky is a viable company due to its crude position in its other companies.

9. The record indicates that Husky was among the first of the West Coast refiners to refine unleaded gasoline and wax crude, the latter requiring substantial changes in the company's North Salt Lake refinery. AR 166, R. 462-463.

Husky's activities in expanding its production and refining capacity, in furtherance of national energy objectives, see Senate and House Conference Reports on EPAA,* the EPAA, as amended, and the Energy Conservation and Production Act (ECPA), 42 U.S.C. § 6801 et seq., are the cause of its losses, rather than "an inferior record of performance." Appellant's Brief 3. Consequently, it is clear that the historical period was unrepresentative of Husky's financial and operating posture and that DOE's action fails to serve the Congressional purpose of alleviating shortages of domestic crude oil and petroleum products expressed in § 4, EPAA and expressly defeats the Congressional purpose of expanding domestic refining capacity through "fostering [the] construction of new refineries by small and independent refiners in the United States . . . ." § 123, ECPA, as amended and carried forward by the DOE Act, and enhancing domestic crude oil production, § 122, ECPA, as amended and carried forward by the DOE Act.

Husky is not here seeking exemption from the Entitlements Program, but exception relief to alleviate "serious hardship or gross inequity" resulting from the imposition of a negative historical profit margin. 10 CFR § 205.50(a)(1). Because "Husky has historically operated its refining and marketing divisions at a loss," Appellant's Brief 16, DOE maintains that the company's negative financial posture is the result of business losses and not the requirements of the Entitlements Program. The historical prof-

it margin and return on invested capital are not factors in the computation of entitlements obligations. They are the standards with which the current profit margin and return on invested capital are compared in order to determine whether exception relief from entitlements purchases is warranted. The entitlements obligation is not the product of a firm's sales and its historical profit margin, and the district court did not so find, see Appellant's Brief 13 and R. 470–471. On the contrary, the court observed that the historical profit margin, when applied to current sales, produces the dollar amount of loss which Husky must sustain before becoming eligible for exception relief and that the greater the sales figure, the greater the loss, a rather anomalous result given the agency's duty to relieve hardship or gross inequity.[10] 10 CFR § 205.50(a)(1).

Because the profit margin is a pre-tax, pre-entitlements purchase figure, it would not be altered if entitlements purchase obligations reduced a profit to a loss. Therefore, Husky faces the prospect of having a negative current profit margin greater than the —1.47% imposed by the DOE in the order of December 15, 1976, or the —2.29% the DOE seeks to impose by the proposed order of December 2, 1977, or perhaps merely breaking even, yet still being obligated to purchase entitlements, in spite of a net pre-tax, pre-entitlements purchase loss. This is the literal application of *Delta* for which DOE argues.

* S. Rep. No. 159, 93d Cong., 1st Sess. 43 (1973), H.R. Rep. No. 531, 93d Cong., 1st Sess. 7 (1973), H. Conf. Rep. No. 628, 93d Cong., 1st Sess. 35 (1973), U.S.Code Cong. & Admin.News 1973, p. 2582.

10. See, also, § 504 DOE Act, which provides for adjustments to "prevent special hardship or unfair distribution of burdens." The conference report, 2 CCH Energy Management ' 10,-389 at 10,392–10,393, indicates that

the FEA has been applying criteria carried forward from the Cost of Living Council despite different language in the FEA Act and the ECPA of 1976. While these more restrictive standards may have been appropriate for

an emergency price control program, the establishment of the Department of Energy and the recognition of a more permanent energy regulatory program requires that the standards specified by Congress be fully and accurately applied, with each criterion given its separate and intended meaning. The managers want to emphasize that adjustments should be granted, consistent with the other purposes of the relevant act, whenever an applicant meets any one of the three grounds for relief, and that relief, including retroactive relief where fairness and the public interest requires, should be of the degree and duration necessary to alleviate special hardship, inequity, or unfair distribution of burdens.

DOE argues against allowing relief for Husky on the grounds that Husky would receive an unfair competitive advantage. Appellant's Brief 11. However, requiring Husky to operate at a negative (loss) level for purposes of exception relief will discriminate against and unfairly burden it as a competitor and impose a serious special hardship and gross inequity on Husky.

■ Because Husky has been assigned a negative profit margin and denied exception relief on the basis of its production profits, the case must be remanded to the DOE. On remand, the DOE is not required "to permit such relief as is necessary to enable the plaintiff to maintain the competitive viability of its refining and marketing operations," as ordered by the District Court, R. 476, nor is the agency required to exempt Husky from the Entitlements Program. *Pasco, supra.* However, DOE must make those adjustments to Husky's historical profit margin and return on invested capital which will relieve the serious hardship and gross inequity which have resulted from the literal application of the *Delta* standard and the imposition of a negative profit margin. DOE has made such adjustments in the past, *see Navajo Refining Company, supra; OKC Corporation, supra; Wickett Refining Company, supra,* and *Famariss Oil Corporation, supra,* and must do so in this case. At present, Husky's standard for exception relief is a negative, or loss, figure based on a period of time that was not representative of its financial and operating posture, which relief effectively puts Husky in a worse position than it was historically and discriminates against Husky vis-à-vis other small refiners.

The DOE's administrative orders are reviewed to determine whether they are "in excess of the agency's authority, or . . . based upon findings which are not supported by substantial evidence." § 211(d)(1) of the Economic Stabilization Act, incorporated by reference in § 5(a)(1) of the EPAA. Great deference is accorded the interpretations of statutes, implementing regulations, and orders by the agency charged with administering them, see *Pasco, supra,* at 1400. Although this court in *Pasco, supra,* at 1404, observed that

> [a]dministrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise, and this court should not be quick to overturn them,

the DOE, by relying on Husky's production activities and imposing a negative profit margin on Husky for purposes of evaluating current financial posture and determining exception relief, issued an order which was beyond its authority and not supported by substantial evidence, is without rational basis, inflicts a serious, special hardship and gross inequity on Husky, and is arbitrary, capricious, and discriminatory.

For these reasons, the case is remanded to the District Court with directions to remand the case to the DOE for reconsideration of Husky's application for exception relief and for appropriate adjustments disregarding and not utilizing any negative historical profit margin, crude oil production activities or profits, or base period years unrepresentative of Husky's historical financial and operating posture. For relief to be meaningful, the same adjustments must be made with regard to Husky's historical return on invested capital.

IT IS SO ORDERED. OUR MANDATE SHALL ISSUE FORTHWITH.