**TWIN CITY BARGE & TOWING CORP. and Ventech Engineers, Inc., d/b/a Twin-Tech Oil Company, a partnership, Plaintiffs-Appellees,**

v.

**James R. SCHLESINGER, Secretary, Department of Energy, Defendant-Appellant.**

**No. 5–34.**

Temporary Emergency Court of Appeals.

Argued March 29, 1979.

Decided July 2, 1979.

---

Jade Alice Eaton, Dept. of Energy, Washington, D.C., with whom Arthur E. Gowran, Dept. of Energy, Washington, D.C., and C. Max Vassanelli and Elizabeth Langer, Dept. of Justice, Washington, D.C., were on brief, for defendant-appellant.

Donald S. Arbour, O'Connor & Hannan, Washington, D.C., with whom Richard G. Morgan, Washington, D.C., was on brief, for plaintiffs-appellees, and Jack R. Bailey, Bailey & Black, Houston, Tex., of counsel, were on brief, for plaintiffs-appellees.

Before ESTES, JOHNSON and GEWIN, Judges.

ESTES, Judge.

### Regulatory Background

The original Phase IV petroleum regulations, 6 C.F.R. § 150.351 et seq., applied to the petroleum industry on a sector-by-sector basis. Pricing regulations were imposed at four levels: producer, refiner, reseller, and retailer. The Government has generally taken the position that natural gas liq-

uids (NGLs) derived from natural gas, rather than from crude oil, have always been controlled.[1] A reading of the refiner regulations, however, raises some doubt as to whether they were specifically designed to apply to natural gas processing plants. These regulations do not, for example, address the unique characteristics of the NGL extraction process, nor the proper treatment of the different raw material feedstocks for a crude oil refinery and a natural gas processing plant. Indeed, in the preamble to the August 9, 1974 Special Propane Rule, applicable only to crude oil refiners, the FEA recognized that:

> . . . while natural gas liquids are subject to the FEA's mandatory petroleum price regulations, increased costs associated with the production or processing of natural gas liquids have generally been minimal and there has been no precise method for passing any increased costs through in the present regulations. The FEA is aware of the need for improving its regulations in this area and will be proposing amendments for this purpose in the immediate future.[2]

Thus there was no clearly applicable regulation or precise method by which a gas plant operator could have calculated his maximum allowable level of product prices. In fact, at the time Subpart K was originally proposed, the FEA stated:

> In effect, the application of the refiner price rules to gas plants has had the result of limiting the lawful prices of natural gas liquids to essentially their May 15, 1973 level.[3]

Historically, the market place at a particular time and location has recognized only one value, or price, for a particular natural gas liquid product, such as propane, with no significance attached to whether it was made from crude oil or NGL. On May 15, 1973, which was to become the base date under Subpart K, propane prices were anything but constant and ranged from 4 to 22 cpg.[4]

Subpart K of 10 C.F.R. Part 212, the first specific regulations for gas plant products, became effective on January 1, 1975.[5] Subpart K is a cost-based regulatory scheme, based upon appropriate "adjusted" May 15, 1973 selling prices. The maximum lawful price for NGLs under these regulations was the sum of:[6]

1) the processor's actual May 15, 1973 sales price ("base price"), or an "adjusted" base price of 8.5 cents per gallon ("cpg") for propane, 9.0 cpg for butane, and 10.0 cpg for natural gasoline, 10 C.F.R. §§ 212.163(a), 212.-164(a);

2) any increased product costs incurred since May 15, 1973, 10 C.F.R. § 212.-165; and

3) any increased non-product costs incurred since May 15, 1973, up to a ceiling of .5 cpg, 10 C.F.R. § 212.166.

It is apparent from these regulations that NGL products are priced differently by each gas plant operator, resulting in a wide range of prices for a single product in a given market.

---

1. 6 C.F.R. § 150.352, the definition of the term "refiner," and Cost of Living Council Question and Answer No. 18, Release No. 467, November 20, 1973, reprinted in CCH Stabilization Program Guidelines, ¶ 41,521. See Jim C. Langdon, Jr., "FEA Price Controls for Crude Oil and Refined Petroleum Products" in Southwestern Legal Foundation Twenty-Sixth Annual Institute on Oil and Gas Law and Taxation, 79–85. At the time this paper was presented, Mr. Langdon was the Associate Assistant Administrator for Price Regulation Development of the Federal Energy Administration.

2. 39 Fed.Reg. 28608 (August 9, 1974).

3. 39 Fed.Reg. 32718 (September 10, 1974). This situation could lead only to confusion as to the lawful prices that NGL plant operators and marketers could charge and consumers could pay. See, *Standard Oil Co. et al. v. DOE*, 596 F.2d 1029 at 1055–1056, 1064, 1069 (Em. App. 1978). See also, *General Electric Co. v. Gilbert*, 429 U.S. 125 at 140, 144, 97 S.Ct. 401 at 410, 412, 50 L.Ed.2d 343 at 357, 359.

4. See Platt's Oilgram, Group 120 Postings and Langdon article, n. 1 supra. See, e. g., R. 277.

5. 39 Fed.Reg. 44407 (December 24, 1974).

6. Although Subpart K has been amended several times, the general pricing rule has remained substantially the same.

The application of these regulations to Twin-Tech Oil Company, a processor of NGLs and NGL products, forms the basis of this appeal.

### Exceptions Process

The Energy Conservation and Production Act of 1976 (ECPA), Pub.L. 94–385, amended § 7 of the Federal Energy Administration Act of 1974, 15 U.S.C. § 766, to provide that:

> Any officer or agency authorized to issue any rule or regulation . . . shall provide for the making of such adjustments, consistent with the other purposes of this Act, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens and shall, by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, rescission of, exception to, or exemption from, such rules, regulations, and orders.

The Conference Report accompanying the ECPA stated that:

> It is not the intention of the conferees, however, that these provisions require the FEA to anticipate all situations in which relief may be appropriate in the future, since the exceptions process is designed in substantial measure to resolve factual situations which could not have been and were not contemplated at the time the general statutory or regulatory programs were adopted.[7]

Title 10 C.F.R. Part 205, Subpart D, contains the procedures for application for an exception from any regulation, ruling, or generally applicable requirement which may adversely affect a person or firm. The basic standards are found in 10 C.F.R. § 205.55(b)(2):

An application for exception may be granted to alleviate or prevent serious hardship or gross inequity. . . .

■ An applicant for exception relief must show that the difficulties or problems facing it are primarily attributable to the DOE regulations from which it seeks a measure of relief.[8] In determining whether the particular regulations in question produce serious financial difficulties for a firm, or serious hardship, the DOE's Office of Hearings and Appeals (OHA)'* generally evaluates "a firm's current and projected financial posture and economic viability in comparison to the firm's historic performance." [9] The OHA considers several factors in analyzing a firm's financial condition, including: the general profitability of the firm, cash flow difficulties, historical and projected return on invested capital and return on equity, significant losses incurred in market share or sales volume, and difficulties in obtaining sufficient supplies of petroleum products.[10]

■ When an exception application is based on gross inequity, the OHA must generally balance the policy objectives of the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. § 751 et seq., and apply criteria which are somewhat broader than those applied to an application based on serious hardship. Exception relief in this category has generally been approved where the application of a particular regulation "significantly frustrates the realization of a major national energy objective," [11] as well as "where a person is adversely affected in a significant manner as a result of the application of a regulatory provision whose purpose has been seriously distorted by anomalous circumstances." [12]

---

**7.** 2 CCH, Federal Energy Guidelines, ¶ 10,521 at 10,480.

**8.** 6 CCH, Federal Energy Guidelines, ¶ 80,006 at 80,009. This volume of CCH contains the DOE's Exceptions and Appeals Guidelines, ¶ 80,004–80,046, which were established by the agency and published pursuant to the requirement of § 104 of the Energy Conservation and Production Act, P.L. 94 385.

\* Formerly the FEA Office of Exceptions and Appeals.

**9.** Note 8, supra.

**10.** Note 8, supra.

**11.** Note 8, supra at 10,010.

**12.** Note 11, supra.

■ While the mere existence of a burden is an insufficient basis for exception relief, relief will be granted upon a showing that a firm is experiencing an adverse impact greater than that of other firms and that the firms' operations are significantly impeded as a result of the adverse impact, that one of the objectives of the EPAA is consequently frustrated, or that the firm is placed in a position different from all other firms similarly situated.[13]

While these criteria are useful, it must be emphasized that

> . . . each exception application submitted to the [Department of Energy] must be considered on the basis of the particular factual circumstances presented in the application, and that the broad, general standards set forth in these guidelines represent only a starting point for the consideration of a particular application.[14]

Title 10 C.F.R. §§ 205.100–205.109 provide for administrative appeals of exceptions decisions and orders. Under 10 C.F.R. § 205.106(3), the denial of an administrative appeal is a final agency action from which an appellant may seek judicial review.

### Administrative History

Shortly after the promulgation of Subpart K, Twin-Tech filed for exception relief from the .5 cpg ceiling on non-product cost increases in order to recover depreciation, higher interest costs, and increased administrative, salary, and general (AS&G) expenses. Relief was denied, and the denial affirmed on appeal, primarily on the grounds that these expenses were those of the Twin City corporation rather than the Twin-Tech partnership. 2 FEA ¶ 80,688 (September 12, 1975). Twin-Tech subsequently refunded $121,955 to Marion Oil Co., its NGLs purchaser.

In the spring of 1976, Twin-Tech became the subject of a DOE audit and in February, 1977, was informed of a potential liability for overcharges of approximately $911,-000.[15]

On October 19, 1976, Twin-Tech filed for exception relief in order to recover increased non-product costs in excess of the .5 cpg ceiling to cover depreciation, interest, and AS&G expenses. Twin-Tech also sought to charge prices for NGLs reflecting the plant's actual first sale prices.[16] Twin-Tech supplied additional pricing information, per agency request, on December 30, 1976, March 1, 1977, and March 21, 1977. On March 28, 1977, a Decision and Order was issued, 5 FEA ¶ 83,126, which granted Twin-Tech a 1.4 cpg adjustment for certain non-recurring start-up costs, but denied all other relief sought. The agency determined that with this 1.4 cpg adjustment, Twin-Tech's weighted average unit selling price would be 10.63 cpg, and since its unit cost was approximately 9.73 cpg, Twin-Tech would have a margin of .9 cpg, which was sufficient incentive to continue the plant operations.[17] However, it should be noted that this weighted average unit selling price was based on a weighted average price using Subpart K adjusted prices of 9.23 cpg, rather than Twin-Tech's own July, 1973 first sale price of 11.64 cpg, which it contends it should be able to use since it was not in business on May 15, 1973.[18] The agency recognized that Twin-Tech was not in business on this date, and, therefore, must determine its first sale price according to 10 C.F.R. § 212.111(b), the New Item Rule.[19] Although the agency was satisfied with a .9 cpg margin for Twin-Tech's 1976 operations, data submitted by Twin-Tech indicate that the agency's Subpart K prices

---

13. Note 11, supra.

14. 6 CCH Federal Energy Guidelines, ¶ 80,004 at 80,008.

15. R. 410–417.

16. R. 232–321.

17. R. 027.

18. R. 026, R. 286.

19. R. 027. At this point it should be noted that Twin-Tech's first sale occurred in July, 1973. The New Item Rule, however, did not become effective until January 15, 1974. 39 Fed.Reg. 1924.

would result in a negative cash flow of approximately $52,076 and a payback of −7.81%.[20]

Twin-Tech filed an administrative appeal and a request for a stay of the March 28, 1977 Decision and Order. The stay was denied on May 19, 1977. The Appeal Decision and Order, issued September 30, 1977, 6 FEA ¶ 80,565, granted Twin-Tech an additional 1.28 cpg in recognition of the fact that

the FEA should have included these administrative and legal expenses in its calculation of the level of exception relief granted to Twin-Tech in the March 28 Decision and Order. . . . [T]he administrative and legal costs which are allocated to Twin City and Ventech are directly associated with the operation of the Twin-Tech gas plant.[21]

The agency denied the relief requested for depreciation expense, interest expense, increased cost of shrinkage, and recomputation of first sale price and refused to consider the merits of Twin-Tech's request for retroactive exception relief.

### District Court Proceedings

On September 22, 1977, Twin-Tech filed a complaint challenging the agency's denial of the stay request. On October 7, 1977, Twin-Tech filed an amended complaint seeking to enjoin application of, and to reverse and remand with directions, the Appeal Decision and Order of September 30, 1977. Following a hearing on November 29, 1977, the District Court granted Twin-Tech's motion for preliminary injunction on December 13, 1977. The District Court's order restrained the DOE from enforcing the March 28, 1977 and September 30, 1977 orders, until entry of final judgment on the merits, to the extent that such orders:

1. restrict plaintiffs from including an imputed shrinkage adjustment in its allowable price to reflect increased product costs incurred by plaintiffs; and

2. restrict plaintiffs from including increased depreciation expenses incurred by plaintiffs in its allowable price; and

3. restrict plaintiffs from utilizing the most recent financial data available in determining all product and non-product cost increases, including those allowances previously permitted by defendant.[22]

It was further ordered that Twin-Tech post a bond of $75,000.

Both parties filed motions for summary judgment. On November 13, 1978, the District Court entered final judgment requiring the DOE

(1) to reopen plaintiffs' request for exception relief;

(2) to permit such prospective relief as is necessary to enable plaintiffs to maintain the competitive viability of their gas processing operation with respect to positive cash flow, net profit and recovery of capital investment;

(3) to address the issue of the proper treatment of royalty payments in conjunction with cost pass-through calculations and exception relief;

(4) to consider the new (post-third quarter 1976) financial data submitted by Twin-Tech in conjunction with cost pass-through calculations and exception relief;

(5) to allow pass-through of the interest expense incurred by Twin City as a result of the $500,000 loan which Twin City obtained in order to purchase its 75 percent interest ownership in Twin-Tech;

(6) to allow pass-through of the increased depreciation expenses incurred by plaintiffs in connection with the gas plant operation; and

---

**20.** R. 286. The agency's serious hardship evaluation focused on per gallon quarterly costs rather than annual financial information.

**21.** R. 431.

**22.** R. 658.

(7) to reach the merits of Twin-Tech's request for retroactive exception relief.[23]

The DOE was also enjoined from enforcing its orders of March 28, 1977, and September 30, 1977.

The DOE filed its Notice of Appeal on December 13, 1978, and appeals from ordering paragraphs 2 and 6 of the District Court's Memorandum and Order of November 13, 1978, on the grounds that the decision conflicts with this Court's decision in *Husky Oil Co. v. DOE and Schlesinger*, 582 F.2d 644 (Em.App.1978).

### Facts

NGLs are liquefied hydrocarbons rendered from wet gas, consisting of butane, iso-butane, propane, ethane, pentanes, and natural gasoline. NGLs represent approximately 16% of all domestically produced petroleum and 10% of total petroleum product demand. NGLs have many uses: in commercial and residential heating, as feedstocks and blending agents, for boiler fuels and peak shaving by utilities, and in agricultural areas.

Twin-Tech Oil Co. (Twin-Tech), a Texas partnership, operates a gas processing plant in Garza County, Texas, and produces NGLs for sale by Twin-Tech. Ventech Engineers, Inc. (Ventech) was the original owner and operator of the gas plant. Twin-Tech was formed in December of 1973 when Twin City Barge & Towing (Twin City) purchased 75% of the assets of the gas plant. A separate agreement designated Ventech as the manager of the plant on behalf of the partnership.

Twin-Tech obtains its raw material from Sun Oil Company, which produces casinghead gas at its Swenson-Garza field. By the terms of the agreement, originally negotiated between Sun and Ventech, Sun must deliver sufficient gas to run the plant and Twin-Tech must remit to Sun 33⅓% of its gross revenues from NGL sales. Twin-Tech must also pay approximately 4% of its gross revenues to H. C. Lewis, a royalty owner. Therefore, roughly 62% of Twin-Tech's production (in gallons) must pay for 100% of its operating costs.[24] Prior to this agreement, Sun had been venting or flaring this gas.

Twin-Tech has a fuel balance system designed to use all the gas in the field. What would otherwise be residue gas is used as fuel for the plant and for Sun's leasehold operations.[25] Twin-Tech has no sales of residue gas,[26] although it, of course, experiences costs with respect to this gas.[27] The Garza plant is thus unique in its ability to use all of the gas in the field and produce no waste.[28]

Ventech signed a contract with Skelly Oil Company for the sale of NGLs on June 13, 1973, and operation of the plant began in July, 1973. The contract price was 11.64 cpg, which at that time closely approximated the average market price for NGLs.[29]

Since July 7, 1974, Marion Oil Co. has been Twin-Tech's purchaser of NGLs. Marion's price was determined by increasing Skelly's base price to reflect Twin-Tech's increased product and non-product costs. This new price also reflected the average current market price, and in March, 1977, Twin-Tech's selling price to Marion was 25.-59 cpg.[30] Marion continues to be the sole purchaser of NGLs from Twin-Tech.

---

23. R. 1276–77.

24. R. 810.

25. R. 820.

26. The plant's location, 72 miles from the nearest pipeline, would preclude any sales of residue gas.

27. Twin-Tech's contract with Sun specifies that as payment for all natural gas consumed by the plant's operations, including that used as plant fuel, Twin-Tech must deliver to Sun 33⅓% of all revenue derived from its sales of NGLs. Twin-Tech must also deliver to Sun residue gas as required for lease operations and development. R. 214. Thus Twin-Tech, under its agreement with Sun, is not entitled to use this gas without cost.

28. R. 821.

29. R. 837.

30. R. 817.

Twin-Tech's gas plant is small by industry standards. Before production began declining in 1977, the plant processed casinghead gas amounting to 4,000 barrels per day (bpd). Due to the small size of the plant, Twin-Tech's per unit operating costs and depreciation expenses are higher than in large processing plants. Moreover, the decline in production from the Swenson-Garza field results in a corresponding decline in output of Twin-Tech's gas plant.[31]

Gas plant production varies seasonally due to weather and pressure conditions. Production is high during the second and third quarters and low during the first and fourth, due to colder weather. Winter production can be off as much as 40–50% from the peak summer production.[32]

### Issues

The appellant, DOE, presents the following question for review by this Court:

### Question Presented

Whether the District Court erred in its decision on remand to the DOE, instructing the agency to grant exception relief to Twin-Tech Oil Company ("Twin-Tech") to the extent necessary to ensure the competitive viability of the firm with respect to positive cash flow, net profit, and also recovery of capital investment through the prospective pass-through of "increased depreciation costs" over the remaining life of the firm's gas processing plant.[33]

The appellees, however, present two issues for review:

1. Whether, having applied the proper standards of judicial review to the administrative record before it, and having spe-

cifically found a causal nexus between the application of DOE regulations and the financial hardship from which Twin-Tech sought exception relief, the District Court acted properly in ordering the DOE, on remand, to permit Twin-Tech a measure of prospective exception relief sufficient to enable it to maintain positive cash flow, net profit, and recovery of capital investment.

2. Whether, having applied the proper standards of judicial review to the administrative record before it, and having specifically found that unexplained denial to gas processors of recovery of increased depreciation costs while at the same time allowing recovery of increased depreciation costs to refiners constitutes gross inequity, the District Court acted properly in ordering the DOE, on remand, to permit Twin-Tech the opportunity to recover its increased depreciation costs in sales of natural gas liquids ("NGLs").[34]

In its exception application, Twin-Tech asserted that the application of Subpart K pricing regulations to its operations resulted in serious hardship and gross inequity in that it had no incentive to continue in business. Twin-Tech was granted a very small measure of relief, adjustments totaling 2.68 cpg. In its September 30, 1977 Order, the FEA computed Twin-Tech's maximum allowable selling price for NGLs to be 12.11 cpg,[35] which was less than half the prevailing average market price for such products.[36] The price resulted in a second quarter, 1977 loss to Twin-Tech of $65,181. In fact, the only quarter in which Twin-Tech made a small profit was the third quarter, 1976, at which time production was at its

---

**31.** When Twin-Tech's plant was built, Ventech had plans to bring in for processing gas from fields within 4½–13 miles of its plant. These plans were never carried out due to subsequent FEA regulations prohibiting crude oil producers from breaking their pipeline connections. Some of this gas is simply not being produced; the rest is being flared. R. 834–5, 10 C.F.R. § 211.63.

**32.** R. 825.

**33.** Appellant's Brief (Apt.'s Br.), 2.

**34.** Appellees' Brief, 2–3.

**35.** The order stated the figure as 11.91 cpg. At the hearing on Twin-Tech's motion for preliminary injunction, counsel for DOE stated that the 11.91 figure was a typographical error and that the correct figure should be 12.11 cpg.

**36.** R. 225.

high point.[37] Production in the field has declined since then, thus decreasing the amount of gas available to Twin-Tech for processing.

Declining production is a reality of the gas processing industry, which was taken into account in the construction and operation of this gas plant. In fact, the plant was built on skids so that it can be moved to another field once production at the Swenson-Garza field is no longer feasible.[38] This anticipated decline in production, however, is not the cause of Twin-Tech's financial problems.

The exhibits Twin-Tech submitted in support of its exception application and again in support of its administrative appeal support its contention that the FEA pricing regulations of Subpart K are imposing a serious hardship and gross inequity on Twin-Tech. The FEA Office of Exceptions and Appeals could not have granted even a small amount of exception relief without a determination that these regulations do in fact cause serious hardship and gross inequity for the company. Furthermore, the District Court stated that:

. . . [T]he defendant in its briefs to this court has contended that Twin-Tech's financial difficulties are not caused by FEA regulations. Although this contention was not made a basis of the FEA orders in question, the court feels obliged to state that the evidence is to the contrary. All plaintiff entities have exercised reasonable business judgment in the formation and operation of the gas plant now run by Twin-Tech, and plaintiffs reasonably expected to earn a sufficient return to sustain that operation profitably before federal regulation began in 1975.[39]

The serious hardship and gross inequity presented in this case are clearly attributable to the impact of the DOE's pricing regulations on Twin-Tech's unique situation. The only issue before this Court is the extent of relief to which Twin-Tech is entitled.

■ The DOE argues that paragraph 2 of the District Court's order requires the agency to insure the economic viability of, or to subsidize, an otherwise uneconomic venture.[40] Paragraph 2 of the order requires the agency

to permit such prospective relief as is necessary to enable plaintiffs to maintain the competitive viability of their gas processing operation *with respect to positive cash flow, net profit and recovery of capital investment.* (Emphasis added)[41]

Rather than a mandatory duty, competitive viability is a regulatory objective which must be balanced "to the maximum extent practicable" with the other objectives listed in § 4 of the EPAA, as this court noted in *Husky,* supra at 650. The DOE is not required "to permit such prospective relief as is necessary to enable plaintiffs to maintain the competitive viability of their gas processing operation," as ordered by the District Court. However, the DOE must consider positive cash flow, net profit, and recovery of capital investment and must make those adjustments which will relieve the serious hardship and gross inequity which have resulted from DOE's application of Subpart K to Twin-Tech. The District Court order specifies certain areas which the agency should consider on remand, in keeping with agency policy and precedent as expressed in its Exceptions and Appeals Guidelines.[42] Twin-Tech must be given a fair, equitable, and non-discriminatory opportunity to compete, not a guarantee of profitability, in the NGLs market.

■ Cash flow, net profit, and recovery of capital investment are three of the factors the DOE examines in analyzing a firm's financial condition for purposes of

---

**37.** R. 207–8.

**38.** R. 835–6.

**39.** R. 1271.

**40.** Apt.'s Br., 11–12.

**41.** R. 1276.

**42.** 6 CCH Federal Energy Guidelines ¶ 80,006 at 80,009.

exception relief.[43] In evaluating Twin-Tech's application for exception relief, however, the DOE focused only on quarterly out-of-pocket per-gallon costs, with no mention of the factors in paragraph 2 of the District Court's order nor any of the other data provided by Twin-Tech. While out-of-pocket per-gallon costs are relevant to the agency's evaluation, they must be considered along with other measures of the firm's financial condition. Taken alone, they are quite meaningless. For example, the .9 cpg margin the DOE calculated on the basis of DOE "allowable costs" in the March 28, 1977 order, and found to be sufficient incentive for continued operations, yielded a pre-tax loss, a negative cash flow, and a negative rate of pay-back for the fiscal year 1976.[44]

The allowable price Twin-Tech needs in order to generate this .9 cpg margin, recognizing only FEA allowable expenses, including AS&G expenses, is 28.28 cpg,[45] yet the DOE argues that Twin-Tech must sell its NGLs at an "adjusted" price of 12.11 cpg. Although the DOE price regulations are based upon a cost-recovery theory, their application to Twin-Tech results in denial of the firm's opportunity to recover its costs.** In the *Superior Oil Company* exception decision, 2 FEA ¶ 83,271 at 83,865, August 29, 1975, the FEA concluded that

. . . [N]o public purpose will be served by prohibiting natural gas processors which have incurred nonproduct cost increases substantially in excess of $.005 per gallon from passing through these cost increases. Indeed, the ability of such firms to increase prices to recover their higher costs will provide incentives for them to increase production. Such price increases should also have only a minimal effect on the purchasers of natu-

ral gas liquids, since such purchasers will in most cases, still be paying less than the current market prices for natural gas liquids. *The FEA has therefore determined that it will, as a general rule, grant exception relief to any gas processing plant which can demonstrate that its non-product costs, since May, 1973, have increased substantially in excess of the $.005 per gallon pass-through permitted under the provisions of Section 212.165.* (Emphasis added)

The DOE's statement of its general rule with respect to non-product costs is also set forth in the Exceptions and Appeals Guidelines, as required by § 104 of the ECPA.[46]

█ All the evidence presented before both the agency and the District Court supports Twin-Tech's position that in the absence of further exception relief it will be unable to continue operation of its gas plant. The 2.68 cpg adjustment in selling price granted to Twin-Tech in the Appeal Decision and Order of April 30, 1977, does not relieve the agency of any further obligation with respect to Twin-Tech, as the DOE has argued. The DOE took a similar position in *Husky Oil Company v. DOE, supra,* where Husky, after having been granted a small but insufficient amount of exception relief in the form of a slight adjustment to its historical profit margin, sought further relief. Finding that the agency's entitlements program was causing the firm serious hardship and gross inequity, this Court remanded the case to the agency for meaningful relief, based on a realistic appraisal of all the facts and circumstances of the case. Because the *Delta* standard, 2 FEA ¶ 83,275 (September 11, 1975),[47] applies to requests by small refiners for exception relief from entitlement pur-

---

**43.** Note 42, supra.

**44.** R. 286. See R. 108, 403–8.

**45.** R. 398.

** The cost recovery theory is applicable to product as well as non-product costs. See § 4(b)(2)(A), EPAA and 10 C.F.R. § 212.167. This discussion is limited to Twin-Tech's non-product costs, since the DOE did not appeal

from those parts of the District Court's order remanding Twin-Tech's product cost issues to the OHA for further consideration.

**46.** 6 CCH Federal Energy Guidelines ¶ 80,004 at 80,008.

**47.** See *Delta Refining Co. v. FEA,* 559 F.2d 1190 (Em.App.1977).

chase obligations, any relief granted to Husky was required to be in the form of adjustments to the firm's historical profit margin and historical return on invested capital. Although the *Delta* standard has no application to Subpart K exceptions cases, the decision in *Husky* is still controlling in this case for the proposition that exception relief must be meaningful and must, therefore, relieve any serious hardship and gross inequity which have resulted from the application of the regulations to the particular firm. See *Husky*, supra at 652, n. 10.

■ Paragraph 6 of the District Court's order requires the DOE "to allow pass-through of the increased depreciation expenses incurred by plaintiffs in connection with the gas plant operation."[48] Although crude oil refiners also processing NGLs and resellers of NGLs are allowed to include increased depreciation costs in their non-product cost increases, gas plant operators are not allowed to do so. DOE supports its refusal to allow such pass-through for gas plant operators on the grounds that depreciation is not an actual out-of-pocket, or cash, expense and that the agency simply has never made adjustments for this type of expense. Twin-Tech contends that DOE's denial of increased depreciation costs for gas plant operators alone is arbitrary, discriminatory, and grossly inequitable.

On its face, this different treatment of depreciation costs for crude oil refiners and gas plant operators, both producing NGLs, is arbitrary and discriminatory. Under 10 C.F.R. § 212.161(b)(2), crude oil refiners which are also gas plant operators must determine their May 15, 1973 selling prices and increased product and non-product costs for their NGLs pursuant to the Subpart K regulations in the same manner as gas plant operators. With respect to all non-product cost increases other than depreciation, the agency's treatment of crude oil refiners and gas plant operators has been the same. In fact, the Exceptions and Appeals Guidelines on non-product cost

pass-throughs in sales of NGLs by gas plant operators under § 212.165 state that

[t]he FEA has also granted exception relief to refiners to alleviate a similar gross inequity which would otherwise result from the application of the provisions of 10 CFR Part 212 Subpart K.[49]

Recovery of depreciation costs is entirely consistent with the present cost-based regulatory program, since depreciation represents the allocation of the original cost of an asset to operations in proportion to the economic benefits received from that asset. Although it is considered a non-cash expense, depreciation is still a cost incurred by the firm. The cost is the cash that was disbursed at the time the fixed asset was acquired. Without recognition of depreciation, the firm's net income is overstated.

The DOE merely relies on its precedent of not granting adjustments to gas plant operators for the pass-through of increased depreciation costs and cites the fact that depreciation is not an out-of-pocket expense. However, crude oil refiners which also process NGLs are also allowed to pass through their increased depreciation costs, which are no different from those incurred by gas plant operators. Crude oil refiners are generally allowed to charge higher prices for their NGLs than are gas plant operators, *Superior Oil Co., supra*, at 83,865; yet gas processors are at the same time denied the benefit of a pass-through of their increased depreciation costs. The DOE has offered no rational basis for this arbitrary and discriminatory difference in treatment of increased depreciation costs for gas plant operators. Twin-Tech has shown a serious present hardship which would justify an adjustment on the basis of its depreciation costs. Such an adjustment would not discriminate in favor of Twin-Tech but would instead serve to relieve some of the severe hardship and gross inequity directly imposed on the firm by the Subpart K regulations.

48. R. 1277.

49. 6 CCH Federal Energy Guidelines ¶ 80,032 at 80,016.

But for the engineering skill, ingenuity, capital management and industry of Twin-Tech's operators, these NGLs would not have been produced. All of the gas would have continued to be flared, polluting the air and directly contravening the very name and purpose of the Energy Conservation and Production Act, 42 U.S.C. § 6801 et seq., which was designed to increase domestic production and refining capacity and conserve energy, as well as the purpose of the EPAA:

> The Emergency Petroleum Allocation Act of 1973 was enacted . . . against a background of severe shortage of crude oil and its products. The principal aims of the Act were to meet the nation's priority petroleum needs, to distribute the remaining available products equitably, and at equitable prices . . .

House Report No. 94–340, quoted in *Mapco, Inc. v. Carter, et al.*, 573 F.2d 1268, 1276 (Em.App.1978), cert. denied 437 U.S. 904, 98 S.Ct. 3090, 57 L.Ed.2d 1134 (1978), and in *Citronelle-Mobile Gathering, Inc. v. Gulf Oil Corp. and FEA*, 591 F.2d 711, 715 (Em.App. 1979).

Twin-Tech has produced approximately 15,341,509 gallons of NGLs.[50] Twin-Tech's operation has been in complete harmony with the national energy objectives expressed in § 4(b) of the EPAA:

(A) protection of public health . . ., safety and welfare (including maintenance of residential heating . . .) . . .; (B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor-owned utilities . . .); (C) maintenance of agricultural operations . . .; (D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petro chemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners . . .; (F) equitable distribution of crude oil, residual fuel oil and refined petroleum products at equitable prices among all regions and areas of the United States . . .; (H) economic efficiency; and (I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

However, the DOE has placed on the back of this small, single-plant gas processor a burden it has not placed on the large U. S. refiners which produce the same NGLs, a burden which will force the shut-down of this plant[51] in the absence of meaningful relief.[52]

---

**50.** R. 286, 319.

**51.** Transfer pricing allows large firms to charge higher prices for their NGLs than can be charged by small firms, which do not have production and refining and marketing divisions. Thus the application of Subpart K to all processors of NGLs, regardless of their size, produces discriminatory results, as in Twin-Tech's situation. Moreover, Twin-Tech's DOE-calculated selling price creates an inherent disadvantage for the company in that it precludes Twin-Tech from competing for additional gas supplies for the plant, since it cannot offer a producer a market price for his gas. Twin-Tech has a supply of natural gas only by reason of its long-term contract with Sun Oil Co. The low Subpart K selling prices do not allow Twin-Tech to secure additional gas supplies and thus run the plant at full capacity. Instead, the plant is operating at approximately 40% capacity, R. 831, and the firm is experiencing such severe hardship as a result of the DOE pricing regulations that, in the absence of meaningful relief, it will be unable to continue its operations.

Such results are inconsistent with the regulatory objectives expressed in the preamble to Subpart K, the gas processor regulations:

> [T]he fundamental objective [of the gas processor regulations] is to permit prices that will be as low as reasonably possible without adversely affecting the availability of the product . . . [T]he FEA must ensure, to the maximum extent practicable, that its regulations do not have an undue adverse impact on any particular segment of the industry.

39 Fed.Reg. 44,407, 44,408 (December 24, 1974).

**52.** See Conference Report, EPAA, 2 CCH Federal Energy Guidelines, ¶ 10,610 at 10,619–11, for a statement of Congressional intent with respect to the pricing of allocated fuels.

The DOE must, consistent with its case-by-case approach to exceptions requests, examine the unique circumstances of Twin-Tech's operation. The agency's duty is not to guarantee the profitability of the firm's operation, but to afford the firm an opportunity, which was taken from it under the DOE orders of March 28, 1977 and September 30, 1977, to compete in the NGLs market. On remand, the DOE is required

(1) to review the entire factual situation with regard to Twin-Tech, including its cash flow, net profit, and recovery of capital investment, for the purpose of ensuring, to the maximum extent practicable, a balancing of the objectives of the EPAA and the ECPA;

(2) to consider pass-through of the increased depreciation costs incurred by plaintiffs in connection with the gas plant operation; and

(3) to grant Twin-Tech meaningful exception relief from the serious special hardship, gross inequity, and unfair distribution of burdens placed upon it, as provided by Congress in § 104 of the Energy Conservation and Production Act, P.L. 94–385, which amends § 7 of the Federal Energy Administration Act, 15 U.S.C. § 766, and § 504 of the Department of Energy Organization Act, 42 U.S.C. § 7194; and *Husky*, supra at 652, n.10 and 653.

For these reasons, the case is remanded to the District Court with directions to remand the case to the DOE for reconsideration of Twin-Tech's application for exception relief.

IT IS SO ORDERED.