## McCULLOCH GAS PROCESSING CORPORATION, a Delaware Corporation, Plaintiff,

### v.

## DEPARTMENT OF ENERGY, Gordon E. Singer, Area Manager for Wyoming, Region VIII, Department of Energy and the United States of America, and James R. Schlesinger, Secretary, Department of Energy, Defendants.

### No. C78–147B.

United States District Court, D. Wyoming.

Oct. 10, 1979.

John B. Speight of Hathaway, Speight & Kunz, Cheyenne, Wyo., Franklin D. Dodge of Kircher, Bressler & Dodge, Los Angeles, Cal., and Richard T. Williams of Kadison, Pfaelzer, Woodard, Quinn & Rossi, Los Angeles, Cal., for plaintiff.

Charles E. Graves, U. S. Atty., D. Wyo., Cheyenne, Wyo., Jo Ann Scott and Don W. Crockett, Dept. of Energy, Washington, D. C., and Stephen G. Plichta, Dept. of Energy, Lakewood, Colo., for defendants.

## MEMORANDUM OPINION

BRIMMER, District Judge.

McCulloch Gas Processing Corporation (McCulloch) in this action challenges the validity of certain revisions to the Department of Energy's (DOE) pricing regulations, and seeks judicial review of two separate DOE and Federal Energy Regulatory Commission (FERC) orders denying the Plaintiff exception relief.

This Court has jurisdiction over both the parties and the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, 1361, 2201 and 2202 and 15 U.S.C. § 754. Venue is properly in the United States District Court for the District of Wyoming by virtue of 28 U.S.C. § 1391(e).

McCulloch is a corporation organized under the laws of the State of Delaware with its principal place of business in Los Angeles, California and its primary site of operations in the Powder River Basin of northeast Wyoming. The Plaintiff is a wholly owned subsidiary of McCulloch Oil Corporation, a holding company also located in Los Angeles. It is a sister corporation of McCulloch Interstate Gas Corporation and McCulloch Gas Transmission Company, both of which are also wholly owned by McCulloch Oil Corporation. The Plaintiff is engaged in the business of processing natural gas to obtain various liquid products including propane, natural gasoline and butane. The principal source of that gas is purchased from oil fields in the Powder River Basin and is commonly referred to as casinghead gas. McCulloch owns or owns in part seven (formerly eight) gas processing plants in Wyoming, South Dakota, and Montana.[1]

The Defendant DOE is a department of the Executive branch of the United States government, is successor to the Federal En-

---

1. The Hilight, Wyoming plant, wholly owned and operated by McCulloch, produces propane (approximately 24,000 gallons daily) and natural gasoline. The Jamison Prong, Wyoming plant, wholly owned and operated by McCulloch, gathers and compresses natural gas to deliver to the Gillette plant, where this stream produces propane (approximately 2,500 gallons daily), butane and natural gasoline. At Gillette, Wyoming, McCulloch owns a 31 percent interest in a plant operated by Atlantic Richfield Company; streams of natural gas processed at this plant other than from Jamison Prong yield to McCulloch propane (approximately 6,900 gallons daily), butane and natural gasoline. The Odekoven, Wyoming plant, wholly owned by McCulloch, produces propane (approximately 6,100 gallons daily), butane and natural gasoline; it also receives and processes natural gas gathered and compressed at Ute and Gas Draw, Wyoming which McCulloch formerly operated as separate gas processing plants. At Well Draw, Wyoming, McCulloch owns a 75 percent interest in and operates a plant producing for McCulloch propane (approximately 2,000 gallons daily) and natural gasoline. McCulloch's Belle Fourche, South Dakota plant, closed since February 17, 1978, produced propane (approximately 4,300 gallons daily) and natural gasoline. The Fairview, Montana plant, wholly owned and operated by McCulloch, produces propane (approximately 6,000 gallons daily), butane and natural gasoline.

ergy Office (FEO) and the Federal Energy Administration (FEA) and maintains field offices in Casper, Wyoming. The Defendant James R. Schlesinger was Secretary of the DOE, having been replaced in that office by Charles Duncan who is accordingly substituted as a Defendant herein for Mr. Schlesinger. The Defendant Gordan E. Singer was an employee of the DOE and the FEA, in the Region VIII Office of Enforcement, serving in the capacity of area manager and supervising a team of auditors which conducted audits of the Plaintiff's gas processing plant operations. Mr. Singer left his employment with the DOE in 1978 and was ultimately succeeded in his function by Robert Templeton, who is also substituted as a party Defendant to this action. Mr. Templeton has supervised work of auditors and investigators in enforcement proceedings involving the Plaintiff and has performed a portion of his official duties in the DOE office in Casper, Wyoming.

Throughout their respective periods of existence, the FEA and the DOE have had the legal authority and responsibility to promulgate and administer allocation and price regulation of petroleum products under the provisions of the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 751 et seq. Pursuant to that authority the FEA and the DOE have enacted and administered a series of regulations which attempt to control the prices of natural gas processors for propane and other natural gas liquid products (NGLP), Subpart K, 10 CFR §§ 212.161–212.173. The DOE's price regulations presently limit a processor's selling price for a NGLP to his price in effect on May 15, 1973 (or adjusted selling price for that date, under 10 CFR § 212.-164), plus adjustments to reflect increased product costs and increased marketing and processing or non–product costs, 10 CFR §§ 212.165–212.167. From January 1, 1975 to October 31, 1978 the Defendants' regulations authorized NGLP processors to pass through to their customers dollar for dollar increases in product costs and increases in non–product costs up to a maximum of one–half cent per gallon, 10 CFR § 212.165.

However, both the DOE and the FEA have, on numerous occasions, granted exception relief from the regulations to permit McCulloch and other gas processors to pass through increased non–product costs in amounts greater than one–half cent per gallon. See, e.g., *McCulloch Gas Processing Corporation*, 3 FEA ¶ 83,003 (Nov. 14, 1975).

On June 3, 1977, in a notice of proposed rulemaking, the FEA observed that:

"With the accumulation of experience under the exceptions process and also under the increased nonproduct cost pass–through provisions of Subpart E (pricing regulations for refiners), the FEA has tentatively concluded that it may be feasible to adopt a more comprehensive approach to increased processing cost pass–throughs under Subpart K. The FEA has concluded that it would be desirable to provide in the regulations for such pass–throughs, if and to the extent feasible, rather than to relegate gas processors to the exceptions process." 42 Fed.Reg. 29492.

These amendments or revisions to Subpart K were adopted, effective November 1, 1978 and were intended to fulfill the purpose of shortstopping the case by case increased non–product exception relief procedures.

The Plaintiff has financed the construction or acquisition of its gas processing plants by borrowing funds at the prevailing interest rates from its parent company, McCulloch Oil Corporation, and from independent third parties. McCulloch has incurred with respect to each of its plants, an amortized cash outlay for the repayment of principal on these loans as well as making cash payments for the accrued interest on the loan indebtedness. The Plaintiff has and is incurring, as to each processing plant, a depreciation expense which McCulloch calculates on a straight line method, thereby apportioning the cost of the plant, less its salvage value, in equal yearly installments over the useful life of the facility.

McCulloch applied for exception relief from the FEA in April 1976 to permit a

price passthrough of certain non–product costs including increased depreciation expense and amortization payments. On June 29, 1976, the FEA issued an order which granted partial relief but denied recovery of the depreciation and amortization expenses. The Plaintiff appealed from this decision and on October 4, 1976 the FEA issued a final administrative order denying the appeal. The FEA decision was consistent with prior holdings of its Office of Exceptions and Appeals in *Farmland Industries, Inc.*, 3 FEA ¶ 83,080 (January 23, 1976), and *Superior Oil Company*, 2 FEA ¶ 83,271 (August 21, 1975). The Defendants stated in those opinions and reiterated to McCulloch that "depreciation does not represent an actual out of pocket cost," and that amortization payments are not a non–product cost as defined in the regulations and do not represent "a net cost to the firm but rather a 'capital transaction' ". *McCulloch Gas Processing Corporation*, 4 FEA ¶ 80,548 at 80,688 (October 4, 1976).

A second application for exception relief involves the Plaintiff's processing plant at Belle Fourche, South Dakota. On January 27, 1978 the DOE issued McCulloch a notice of probable violation (NOPV) in which the Department alleged that the Plaintiff's pricing computations from August 1973 through February 1978 were erroneous and improper under the applicable DOE regulations. Based on the NOPV, McCulloch determined that under the DOE's regulations it could not have operated the Belle Fourche plant profitably at any time since August 1973 without exception relief and therefore chose to suspend operations on February 17, 1978. The Plaintiff has continued to keep the plant closed to protect its maximum salvage value.

On March 15, 1978 McCulloch filed an application with the DOE's Office of Administrative Review seeking exception relief to permit a higher sales price for NGLP's produced at the Belle Fourche plant than would otherwise be permissible under the DOE regulations. The Department issued a proposed decision on July 24, 1978 denying relief to McCulloch on the ground that the Belle Fourche plant was profitable absent deduction of depreciation costs attributable to the plant. The DOE ultimately filed a final decision in November 1978 denying exception relief on the same grounds. This order was appealed to the FERC which, after much bureaucratic thrashing, affirmed the denial of exception relief by applying the new Subpart K amendments and concluding that the Plaintiff had not sustained a serious hardship or gross inequity. The FERC's order constitutes a final agency action which is ripe for judicial review.

The third area of controversy arising in this action concerns the Plaintiff's substantive and procedural challenges to the Subpart K amendments which became effective on November 1, 1978. 43 Fed.Reg. 42,984, 10 CFR § 212.161 et seq. There are no administrative procedures for testing the validity of regulations such as the Subpart K revisions. Thus, the rulemaking is tantamount to a final administrative order and is properly before the Court. *Standard Oil Co. v. DOE*, 440 F.Supp. 328 (ND Ohio 1977).

The original version of Subpart K of 10 CFR § 212, regulating prices of NGLD's became effective on January 1, 1975 pursuant to regulations issued by the FEA, 39 Fed.Reg. 44407. The FEA noticed a proposed rulemaking on June 3, 1977, setting forth specific proposals for amendments to Subpart K and inviting comments on the revisions and other topics including gathering expenses for natural gas liquids. The Plaintiff's objections focus on four separate amendments, the first of which relates to depreciation expenses. In the June 3, 1977 notice the Defendants generally abandoned their former policy toward depreciation expense by stating that:

Previously, the Office of Exceptions and Appeals has not permitted the recovery of depreciation cost increases which were in excess of the ceiling contained in present § 212.165, on the basis that such "costs" do not represent actual "out–of–pocket" cash outlays for which exception relief would be appropriate. However, as

the period of controls lengthens, it appears appropriate to the FEA to recognize and permit the passthrough of such increased costs in order to reflect recognition of the fact that gas plants are aging and to provide the necessary stimulus for continued plant construction and reconstruction. 42 Fed.Reg. 29493.

The final revisions to Subpart K require that depreciation of gas plant investments must be computed for DOE on a units of production accounting basis. 10 CFR § 212.165(b)(2)(1). That procedure allocates the same amount of depreciation expense to each gallon of NGLP whenever produced. McCulloch asserts that the units of production method will deny it the right to recover millions of dollars of depreciation expense due to the Plaintiff's historical practice of depreciating gas plants using the straight line method of accounting.

The second Subpart K revision to which the Plaintiff takes exception relates to the disallowance of certain general and administrative expenses unless they directly and exclusively are attributable to gas plant operations. 10 CFR 212.165(b)(2)(v). McCulloch objects to this exclusivity requirement as prohibiting small gas processors whose administrative personnel and expenses are distributed among gas processing and other business operations of sister corporations from recovering any part of such expenses in its NGLP prices.

The third challenged amendment involves the passthrough to consumers of a processor's interest expense. The new regulation would limit the recovery of interest to borrowing from an unrelated entity, 10 CFR § 212.165(b)(2)(viii). McCulloch alleges that this revision would deny recovery of actual out–of–pocket expenses and discriminate against firms with limited independent credit standing.

The final revision which McCulloch finds objectionable is the regulation concerning gathering expenses. This provision excludes the passthrough of expenses incurred in the construction and operation of gas plants if the owner has a beneficial interest in the residue gas from the plant. 10 CFR § 212.162.

McCulloch has also taken issue with the Defendant's failure to observe various administrative procedures in regard to the rulemaking. The Plaintiff maintains the Department solicited and received ex parte comments on the proposed amendments, failed to provide adequate notice of the actual revisions, failed to separate the regulatory and enforcement arms of the agency, and further failed to prepare adequate economic and environmental analysis of the amendments.

McCulloch has therefore instituted this action seeking, *inter alia*, that the Court declare the 1976 and 1978 denials of exception relief and the enactment of the challenged Subpart K revisions to be arbitrary and capricious, lacking in substantive evidence and a rational basis, and in excess of the Defendant's statutory and regulatory authority. The Plaintiff requests that the DOE permit exception relief to allow recovery of the Plaintiff's depreciation and amortization expenses and be enjoined from enforcing the Subpart K amendments in issue.

The Defendants have generally denied the Plaintiff's allegations contending that the agency actions were not arbitrary or capricious and had a rational basis.

This Court is well aware of the mandates governing review of regulations and order issued by DOE. Section 211(d)(1) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, which is incorporated by reference in Section 5(a)(1) of the EPAA 15 U.S.C. § 754(a)(1) provides:

(N)o regulation of any agency exercising authority under this title shall be enjoined or set aside, in whole or in part, unless a final judgment determines that the issuance of such regulation was in excess of the agency's authority, was arbitrary or capricious, or was otherwise unlawful under the criteria set forth in Section 706(2) of Title 5, United States Code, and no order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines

that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

In *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) the Supreme Court outlined the parameters of judicial review of administrative rulemaking by holding:

"The Court is first required to decide whether the Secretary acted within the scope of his authority . . .

Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority . . . Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law . . .' To make this finding the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency."

■ It is not necessary that the result of the agency action would have been the same as that reached by the Court so long as there exists a rational basis for the conclusion approved by the administrative body. *Pasco Inc. v. FEA,* 525 F.2d 1391 (Em.App.1975); *Pacific Coast Meat Jobbers Assn. Inc. v. Cost of Living Council,* 481 F.2d 1388 (Em.App.1973).

## SUBPART K–REVISIONS

The Court would initially note that during the course of pretrial discovery the Plaintiff was allowed to take the depositions of those persons directly involved in the drafting of the Subpart K Revisions. Such discovery was reluctantly permitted for the purpose of ascertaining whether or not the administrative record in this case was complete. The Court set strict guidelines limiting inquiry regarding the amendments to the specific factual matters relied upon in reaching their decision and prohibiting any questioning as to the subjective mental processes employed by the deponents. We recognized that "When there is a contemporaneous explanation of the agency decision, the validity of the action must 'stand or fall on the propriety of that finding.'" *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), and that the judiciary knows far better than any other branch of government, that the sanctity of the decision makers analytical methods should be preserved and not subject to probe by parties who disagree with the official action.

However, in the case at bar it became apparent from transcripts of Congressional hearings that drafts of the Subpart K amendments were disseminated to select industry lobbyists after the time for public comment had passed. Those drafts differed in some important respects from the final rulemaking, raising the issue of whether ex parte comments had been received subsequent to the cutoff date for public response. The Court determined that it was necessary to inquire as to the completeness of the administrative record. See: *Citizens to Preserve Overton Park v. Volpe,* supra at 419–420, 91 S.Ct. at 825. The resulting depositions and other evidence did reveal that such ex parte comments were received after that cutoff date and that the Department actually initiated such ex parte communications on one occasion. (Deposition of Roger Miller, at 50).

The depositions were revealing in one other respect. The principal individuals involved in drafting the Subpart K revisions were Clifford Russell, Maurice Boehl, and Roger Miller. Their testimony demonstrated that they lacked formal training or practical expertise in gas processing or accounting for gas processing plants and that not one of these men had ever visited a processing facility. Moreover, in the face of their own general lack of training, knowledge, or experience, these draftsmen failed to seek adequate information from or about the

processing industry or about the impact of their proposed amendments to Subpart K. For example, Mr. Boehl stated that he did not collect any information himself with regard to the practices of the industry in accounting for depreciation expense, nor did he direct anyone else to collect information on that subject. Mr. Boehl gave similar responses to questions relating to interest expense, gathering expense and general administrative expense. (Deposition of Maurice Boehl at 44–48). Clifford Russell testified that he did not undertake any collection of facts with respect to the amount of depreciation expense of gas processors between 1973 and 1978 nor did he seek a study and was unaware of any study on that subject. Mr. Russell also acknowledged that he did not conduct any study on the amounts of general and administrative expense incurred by gas processors between May 1973 and 1978. (Deposition of Clifford Russell at 89–91). The testimony of Roger Miller indicates that he did not collect nor direct the compilation of information from the industry regarding accounting practices for depreciation, general and administrative expense, interest expense and that the extent of his information on gathering expense was limited. (Deposition of Roger Miller at 47–48).

The nub of this entire controversy involves McCulloch's unsuccessful attempts to charge consumers for its increased depreciation expenses. In the Subpart K revisions the Department abandoned its longstanding policy of denying passthrough of that expense "in order to encourage replacement of aging plants and improvements of existing ones" 43 CFR 43987. As noted earlier, the Defendants concluded that this should be accomplished by requiring firms to compute their depreciation costs on a "units of production" basis. That procedure divides plant investment, less salvage value, by the number of gallons of products estimated to be produced over the useful life of the product. The notice of rulemaking made no reference whatever to the units of production method of depreciation, but rather stated that such expenses must be calculated historically according to generally accepted accounting principles, consistently applied by the company. The notice further provided that the "output adjusted method" of comparing costs in a current month with costs in the base month of May 1973 would be used in order to determine whether a particular firm has sustained increased costs. The "output adjusted method" as delineated in the notice divides all current costs within designated categories by current production volumes and compares the resulting cents–per–gallon figure with a cents–per–gallon figure obtained by dividing May 1973 costs by May 1973 production volumes. This procedure does not relate to a firm's accounting procedure for depreciation and did not give notice that the units of production method would be employed in the Subpart K revisions as the Defendants assert.

McCulloch and other gas processors utilize a straight line basis of calculating depreciation, apportioning the expense of the plant in equal per annum dollar amounts over its useful life. However, under the output adjusted method of comparing costs, the straight line account procedure actually results in an increased depreciation expense each year, since production volumes are declining. No such increases occur under the units of production method due to the even allocation of the expense over each gallon produced.

Thus, pursuant to the new regulations, a processor cannot incur increased depreciation expense unless it has made capital expenditures after May 1973. The Department is, in effect, advising all processors that they should have historically been using the units of production method and other depreciation expenses accordingly.[2]

Those firms which did use that method of accounting are not affected, but the regula-

---

**2.** The Department and FERC assume that the May 1973 base costs include a units of production depreciation expense. Proposed order affirming Belle Fourche exception denial at 7.

Therefore the Defendants must also assume that the Plaintiff was using a units of production method prior to May 1973 and has fully recovered those earlier costs.

tion fails to provide for those firms which employed a straight line basis and did not take larger volumes of depreciation during the plant's formative years. The adverse result of this rulemaking is set forth in Plaintiff's exhibits 8a–9 which depict millions of dollars in lost depreciation expense.

Comments to the notice of rulemaking applauded the DOE's decision to permit passthrough of increased depreciation costs. However, the actual result of the final amendments was to punish and discriminate against companies which had historically adhered to a straight line method of accounting. Firms which had used a units of production basis were able to get returns on their invested capital while other firms, like McCulloch, were not. If the Department had gathered sufficient information regarding the industry's accounting procedures or provided adequate notice of the intended revisions, the deficiencies in the rulemaking may have been averted.

The frailty of this amendment is further underscored when one considers that by adopting the units of production account practice the Defendants' announced goal of replacing the gas plants that were then reaching the end of their useful life was made unattainable. Gas processors which had used the straight line method of accounting were foreclosed from recovering depreciation expenses on older operations and thereby discouraged from constructing new facilities, while the firms that were most benefited by the action were those that had constructed relatively new plants.

It is virtually impossible for this Court to determine upon what grounds the Department based its decision to treat increased depreciation expenses as it has in the amendments. The DOE did not attempt to apprise itself of the industry's current ability to obtain return on invested capital, nor did it even determine the number of firms, if any, which used the units of production method of accounting.

The Defendants contend that: "Our primary reason for requiring the units–of–production method of calculating depreciation costs is that it appears to correspond most nearly to the probable economic judgments underlying investment in gas plant facilities and that *it will avoid increased NGL prices* based on little more than accounting treatment having no necessary relation to the underlying economic realities." 48 CFR § 42988. The DOE's contention may be theoretically correct and useful in the future, but the regulations' enactment is not evenhanded in its present application. The Department's obvious overriding concern of keeping sales prices at a minimum cannot justify its failure to examine the actual economic practices of the processing business.

The Subpart K revisions pertaining to general and administrative expenses exclude recovery of business costs incurred for general management, accounting and legal work unless these functions are performed exclusively for a gas processor and are directly attributable to gas plant operations. The comments received from the industry relative to the proposed rulemaking universally objected to the exclusivity required. The industry response pointed out that such a mandate would discourage a company from making optimum use of its manpower, resources and actually increase NGLP prices due to the necessity of having to employ separate or outside management, legal and accounting personnel in order to pass through these expenses.

The cross–utilization of internal personnel is obviously the most, if not the only, logical approach for McCulloch and other processors who have related business interests to pursue in conjunction with performance of administrative functions. These small companies cannot economically employ separate legal and accounting personnel for each of their related companies. However, the regulation leaves the processor with little incentive to do otherwise, and that results in the passthrough of such costs to the consumer.

The DOE states that the regulation was promulgated in this form because "it cannot reasonably be assumed that those . . . costs would be eliminated in the absence of gas plant operations where the firm also en-

gages substantially in other operations." 43 CFR 42990. This allegation is not supported by the administrative record. Certainly there is nothing before the Court or which was before the DOE to explain why a firm would not dispose of excess management personnel if the company discontinued gas processing operations. Rather it appears that the draftsmen either had failed to collect or had otherwise ignored information from the industry regarding the revision, and indeed the amendment may well cause the opposite effect of that intended by the rulemakers.

The evidence adduced at trial indicates that McCulloch may be prohibited from passing through some $250,000.00 per year in these costs, and that if the Plaintiff were required to fully staff its companies with exclusive management personnel the expense to consumers would be approximately $340,000.00 per year. (Plaintiff's Exhibit 16). This irrational solution to a seemingly simple allocation problem penalizes a firm for managing itself efficiently or penalizes the consumer if it does not.

The Subpart K amendments limit the recovery of interest expense to borrowings from an unrelated entity. McCulloch borrows funds from its parent corporation as well as from outside lenders to obtain working capital. Under the new regulations the interest expenses incurred by way of loans from McCulloch Oil Corporation cannot be passed through to the Plaintiff's consumers. This limitation affects smaller processors like McCulloch much more harshly than large companies which have the financial standing to procure independent credit.

The Defendants have apparently enacted this measure to prohibit "sweetheart loans" that would artificially increase consumer costs. However, there is nothing in the record to establish that such loans are commonplace or that related entities are incapable of arms' length transactions, thereby necessitating a rule that all interest on borrowings from a parent corporation should be excluded as improper expenses. The comments which address the issue observe quite correctly that the parent company or related entity has a duty to shareholders to show a fair return on invested capital.

If DOE is of the opinion that improper loans have been made, it may, as the Defendants note, initiate audits to determine whether a possible violation has occurred. The procedure appears to be far more appropriate than denying all such interest costs on the premises that some loans between related entities may be illegal. The results of the rulemaking simply gives some companies the unfettered right to recover their interest expenses while denying that opportunity to other firms.

The Department has suggested that the Plaintiff may pass through this expense as well as some of the other prohibited nonproduct expenses via the exception process. However, requiring the Plaintiff to resort to the exception process to pass through the same expenses that are automatically passed through to the consumers of other companies is discriminatory in nature. In order to obtain exception relief a firm must demonstrate "gross inequity" or "serious hardship". This is a far more stringent standard than that imposed on a company which is able to borrow from an unrelated entity.

The Court is of the opinion that the nature of the expenses of both such companies is identical. It would be incongruous and grossly inequitable to differentiate between companies in the pass through of their interest costs.

The new revisions further prohibit the recovery of costs associated with constructing and operating gathering systems for gas plants whose owner has a beneficial interest in the residue gas from the plant.

Gathering systems, which bring gas to the plant, perform an integral function of the operation of the plant and are related to the extraction process. Many of the comments received in response to the notice urged the DOE to consider gathering systems as part of the gas plant and allow recovery of the resulting costs.

The FERC permits an allowance for the partial recovery of gathering expenses by

producers of natural gas. The gathering lines also benefit gas transportation and sales operations. It was on these bases that the beneficial interest provision was adopted. The draftsmen of the Subpart K revisions obtained no specific facts from the FERC concerning its decision to include gathering expenses in the rates permitted to be charged by producers, or how such expenses were calculated. The testimony at trial demonstrated that actual gathering expenses exceed the FERC allowances since the volume of residue gas leaving a plant is much less than the volume of gas gathered. Thus, in the comments the Defendants were advised that the expense of gathering must be recovered from the sales of NGLP's or it would not be recovered at all.

McCulloch has expended several million dollars for the construction of gathering facilities and for their operations at its gas processing plant. The FERC allowances do not, however, permit the Plaintiff to recover the majority of this investment and cost. Additionally, the rulemaking may well affect depreciation expenses in connection with gathering systems.

The Defendants virtually admitted that this Subpart K revision is inadequate by stating:

> Although we recognize that in some cases a portion of the costs associated with gathering facilities could logically be considered attributable to liquids even where the entity bearing such costs also has an interest in the residue gas, we have concluded that the passthrough of any of these costs in NGL and NGL product prices should not be permitted until we obtain further information which assures that these costs will not also be recovered in gas sales prices. Then it may be possible for us to prescribe a rule with more specific conditions and limitations for the passthrough of those costs in NGL prices.

It is the opinion of the Court that the challenged amendments to Subpart K create a serious hardship for McCulloch and therefore cannot be applied against the Plaintiff so as to prohibit passthrough of the various expenses. The enactment of these revisions followed an almost incredible process of rulemaking. By their own admission the draftsmen had no experience in the gas processing field. They proceeded to obtain little, if any, information about or from the industry before proposing the new revisions, and thereafter they generally disregarded the comments which posed objections to the particular revisions now in issue.

It is evident that the regulations were designed to minimize the price of NGLP's for consumers. In so doing, however, the Department has promulgated regulations which permit the passthrough of certain expenses for some firms, but deny other companies recovery of millions of dollars in identical expenditures. Such discrimination is impermissible, especially when there does not appear to have been any real consideration of the economic realities of the industry, or the total effect of the proposed amendments on the processors involved. Requiring the Plaintiff, in the alternative, to proceed through the tedious exception and appeal channels to possibly recoup these costs, or perhaps be denied relief, is similarly inequitable. The general inadequacy of the revisions is highlighted by the depreciation and administrative expense enactments which defeat their own goals. Such uninformed tinkering with the gas processing business is arbitrary and capricious and without rational basis.

The Plaintiff also challenges the Subpart K revisions on the basis of several alleged procedural deficiencies in the rulemaking. Although the DOE's notice provided that the time for public comment would expire August 1, 1978, a substantial number of oral and written ex parte communications were received months after the cutoff date and were not made a matter of public record available for review. The draftsmen testified that they received correspondence, and oral telephone calls from the industry each week which addressed substantive aspects of the rulemaking. (Deposition of Maurice Boehl at 106–108 and Plaintiff's exhibits 23–27.) Furthermore, representa-

tives of the FEA admitted in Congressional hearings that early drafts of rulemaking were revealed to industry lobbyists possibly resulting in other ex parte comments (See, Plaintiff's Exhibits 34–36). Finally, Mr. Miller acknowledged that on one occasion he solicited ex parte comments on transfer pricing. (Volume VIII of the Administrative Record).

While such ex parte comments seem highly inappropriate, they do not appear to be prohibited under the Administrative Procedure Act during informal rulemaking proceedings like those in issue here. 5 U.S.C. § 551, et seq. *Action for Children's Television v. FCC*, 564 F.2d 458 (D.C.Cir.1977); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, supra, 435 U.S. at 524, 98 S.Ct. at 1202. In any event, all such ex parte matters have now been placed before the Court.

■ The Court has also considered the Plaintiff's procedural objections in regard to preparation of environmental impact and economic analysis statements and the failure to separate regulatory and enforcement functions within the Department in accordance with 42 U.S.C. § 7136(a), and concludes that the Plaintiff lacks the requisite standing to raise such objections and that its contentions are otherwise unpersuasive.

■ The Plaintiff finally asserts that certain provisions of the Subpart K amendments were invalid due to the Defendant's failure to comply with 5 U.S.C. § 553 of the Administrative Procedure Act and 15 U.S.C. § 761 of the FEA Act. 5 U.S.C. § 553 provides in pertinent part:

(b) General notice of proposed rule making shall be published in the Federal Register ... the notice shall include–

(1) A statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

. . . . .

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

This provision does not require precise notice of each aspect of the regulation to be adopted but only mandates "a reasonable opportunity to participate in the rulemaking process" *Forester v. Consumer Product Safety Commission*, 559 F.2d 774 (D.C.Cir. 1977). In the case at bar the Plaintiff and other processors were generally given ample notice of the proposed amendments. While no specific proposal was made relative to gathering facilities and the definition of a gas plant, the beneficial interest in residue gas concept was explicitly referred to and comments were requested on the overall subject. We cannot find the notice inadequate on that subject.

■ However, the Court must conclude that the notice was insufficient with respect to depreciation. Nowhere in the proposed rulemaking was there a reference to the units of production method of accountings except for some very insignificant colloquy at the public hearing. The comments totally reflect this lack of notice by the conspicuous absence of any mention of the units of production accounting basis. The obvious reason for this omission is the Department's statement that a "firm must use generally accepted accounting methods which have been historically and consistently applied by it", 42 Fed.Reg. 29492. The units of production method has a direct and substantial impact on the Plaintiff and probably other processors. Their inability to comment and participate in the rulemaking process regarding depreciation expense and accounting was severely curtailed by the substance of the notice. Therefore, the rulemaking procedure insofar as it relates to the Subpart K amendments on depreciation expense is invalid and must be set aside.

*Wagner Electric Corporation v. Volpe*, 466 F.2d 1013 (3rd Cir. 1972).

### 1976 Exception Relief

The Energy Conservation and Protection Act of 1976, 15 U.S.C. § 766(b) provides in part:

> Any officer or agency authorized to issue any rule or regulation ... shall provide for the making of such adjustments, consistent with the other purposes of this [Act], as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens and shall, by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, rescission of, exception to, or exemption from, such rules, regulations, and orders.

Thus, Title 10 CFR § 205, 55(b)(2) sets forth the basic standards for exception relief by stating:

> An application for exception relief may be granted to alleviate or prevent serious hardship or gross inequity.

(See also 42 U.S.C. § 7194(a) of the Department of Energy Organization Act.)

In *Twin City Barge & Towing Corp. et al. v. Schlessinger, et al.*, 603 F.2d 197, 201, (Em.App.1979), the Emergency Court of Appeals noted in regard to the exception process that:

> An applicant for exception relief must show that the difficulties or problems facing it are primarily attributable to the DOE regulations from which it seeks a measure of relief. (6 CCH Federal Energy Guidelines ¶ 80,006 at 80,009). In determining whether the particular regulations in question produce serious financial difficulties for a firm, or serious hardship, the DOE's Office of Hearings and Appeals (OHA) generally evaluates "a firm's current and projected financial posture and economic viability in comparison to the firm's historic performance." The OHA considers several factors in analyzing a firm's financial condition, including: the general profitability of the firm, cash flow difficulties, historical and projected return on invested capital and return on

equity, significant losses incurred in market share or sales volume, and difficulties in obtaining sufficient supplies of petroleum products. (Ibid).

.    .    .    .    .    .

> While the mere existence of a burden is an insufficient basis for exception relief, relief will be granted upon a showing that a firm is experiencing an adverse impact greater than that of other firms and that the firms' operations are significantly impeded as a result of the adverse impact, that one of the objectives of the EPAA is consequently frustrated, or that the firm is placed in a position different from all other firms similarly situated. (Ibid at 10,010)

The Court goes on to hold that each exception application must be considered on the basis of its own particular factual circumstances. *Twin City Barge & Towing Corp. et al. v. Schlesinger, et al.*, supra, 603 F.2d at 202.

The evidence adduced at trial and the administrative record demonstrate very clearly that the Plaintiff's application for exception relief was denied solely because of the Department's policy of disallowing depreciation as an increased non–product expense under any circumstance. The Defendant summarily observed in a footnote that depreciation is not an actual cash expense and would therefore not be considered in computing non–product increases.

■ The depositions of those involved in the appeal indicate that the time given to McCulloch's case may have been as brief as a few minutes. Certainly there was no analysis of the actual issues involved in the case, no effort to determine or consideration of whether the Plaintiff was incurring serious hardship or gross inequity. The Department made no findings at all with regard to the firm's cash flow, net profit, or return on invested capital.

This type of mechanical approach to the exception process is impermissible. In *Twin City Barge & Towing Corp. et al. v.*

*Schlesinger, et al.,* supra, 603 F.2d at 208, TECA held that depreciation is a proper non–product expense if the circumstances of the particular case warrant exception relief:

> Recovery of depreciation costs is entirely consistent with the present cost–based regulatory program, since depreciation represents the allocation of the original cost of an asset to operations in proportion to the economic benefits received from that asset. Although it is considered a non–cash expense, depreciation is still a cost incurred by the firm. The cost is the cash that was disbursed at the time the fixed asset was acquired. Without recognition of depreciation, the firm's net income is overstated.[3]

The TECA went on to conclude that cash flow, net profit and recovery of capital investment are three factors which the DOE must examine in analyzing a company's financial condition. Here, as in *Twin City Barge,* supra, the Defendant considered only McCulloch's quarterly out–of–pocket per gallon costs (excluding amortization) without evaluating the factors enumerated by the Court of Appeals.

McCulloch has proved that it sustained some 3.5 million dollars in increased depreciation expenses since the 1976 denial of exception relief. These costs cannot be ignored as the DOE apparently suggests. Nor can they rationally be attributed exclusively to the year in which the plant was built or purchased. The replacement of old plants and the promotion of further production is dependent upon the recovery of depreciation expense. The DOE explicitly recognized this fact by adopting the new Subpart K amendments in an attempt to permit recovery of these costs. 43 Fed.Reg. 42987. McCulloch's predicament is further amplified by the actual cash outflow it is incurring for amortization payments. This expenditure is closely related to depreciation in that it involves the repayment of principal on loans whicḧ financed the acquisitions of the plants.

It is the opinion of the Court that the Plaintiff has sustained a severe hardship by being required to incur millions of dollars of unrecovered depreciation expenses, particularly when viewed in light of the actual amortization cash payments expended. One of McCulloch's plants has been shut down completely due to this situation; others presumably may have similar fates. In enacting the EPAA Congress did not envision that the FEA or the DOE would engage in a defacto confiscation of the Plaintiff's property in order to keep NGLP prices at a minimum. Nor did Congress intend that the Defendant should remove the incentive to build new plants and increase production. The interests of the public and the processor must be balanced. See 15 U.S.C. § 753(b)(1)(D). In the case at bar the Departments did not determine whether depreciation and amortization expense caused the Plaintiff a serious hardship since those matters were only considered, if at all, in a perfunctory manner. Instead, the Department simply invoked its per se policy of excluding depreciation expenses, a policy which has not similarly been applied to crude oil refiners. Based on the record before us there is no rational basis for the denial of exception relief and no basis whatsoever other than the Defendant's opinion that depreciation is not an out–of–pocket expense. TECA, and this Court, too, as well as the Defendants in the Subpart K revisions, have concluded that depreciation is a proper expense. There-

---

**3.** A basic college text on economics, *"Exchange and Production: Competition, Coordination and Control",* by Armen Alchian and William R. Allen of the University of California, Los Angeles, states: "Depreciation is a cost–even though it is neither an expenditure nor an obligation to spend. Because it is a reduction in value of an asset, it is a cost." The recognition of depreciation as an expense to be subtracted from gross revenues in computing profitability and return on invested capital is a generally accepted accounting principle which has been adopted by the American Institute of Public Accountants, Financial Standards Board, the Security and Exchange Commission, the Internal/Revenue Service and has also been included in the regulations of numerous other federal and state governmental agencies including the DOE in its treatment of crude oil refiners.

fore, the matter must be remanded to the DOE to determine whether the Plaintiff has sustained a serious hardship or gross inequity relative to its application for exception relief. In considering that application the Defendant must examine McCulloch's cash flow, net profit and return on invested capital in order to properly evaluate the Plaintiff's financial condition and render appropriate relief.

### 1978 *Exception Relief*

The DOE adhered to their inflexible policy of denying exception relief for increased depreciation expenses in the 1978 Belle Fourche applications, without any meaningful analysis of the Plaintiff's return on invested capital, cash flow or net profitability. It is interesting to note that in denying exception relief the defendants held that depreciation is an expense which generally does not affect a firm's incentive to continue production, and at virtually the same time the DOE was promulgating the Subpart K revisions which permit passthrough of increased depreciation costs to "stimulate additional plant construction . . . and NGL product supply." 43 Fed.Reg. 42987.

The anomolous effect of these new revisions, as previously noted, is that depreciation of original capital investments in plants in existence in May 1973 continues to be excluded. The reason for this exclusion is that the Department or the FERC has assumed that May 1973 prices include costs attributable to depreciation calculated on a units of production basis.

This can only be interpreted as meaning that the Defendants also assume that a firm has historically used the units of production method of accounting. (See, proposed order of presiding officer at Page 7.)

In considering the Plaintiff's appeal from the DOE decision, the FERC examined McCulloch's application for exception relief in light of the Subpart K revision pertaining to depreciation. FERC determined that by applying the units of production principle to McCulloch the Plaintiff has not sustained a gross inequity or severe hardship.

The DOE's assumptions and FERC's decision based thereon would be proper if the Plaintiff had historically utilized the units of production accounting method, but, McCulloch did not follow that practice. Depreciation expense as delineated by DOE in the new amendment will typically be greater in the early years of a facility and decline thereafter as production declines. This is not true with respect to the straight line method used by the Plaintiff in which the expense is allocated equally from year to year and actually results in an increased expense under the output adjusted cost comparison procedure.

■ The Defendants have erred in not examining McCulloch's actual return on invested capital, cash flow and net profitability. The result is to punish the Plaintiff for failing to use the accounting practice mandated in the regulations even though the amendment was not promulgated until many years after McCulloch had adopted and used a different method of depreciating assets. The denial of exception relief cannot be based on economic assumptions which are enacted into a regulation. There must be some consideration of the particular circumstances of the case. *Twin City Barge & Towing Corp. et al. v. Schlesinger, et al.*, supra.

McCulloch determined at the time the application for relief was submitted that the Belle Fourche plant could not operate at a profit under the DOE pricing regulations. The plant was therefore closed and remains closed some nineteen (19) months later. If the Plaintiff were able to operate the plant profitably as the Defendant apparently contends, McCulloch would certainly have reopened business activities by now. The time has long since passed when McCulloch could afford to test the administrative and judicial waters in hopes of getting exception relief and at the same time allow a profitable concern to remain inoperative. This is underscored by the fact that the Plaintiff incurs some $30,000.00 in monthly expense at the Belle Fourche plant for maintenance, taxes, insurance, security and depreciation.

Neither is this Court impressed with the arguments that the Belle Fourche plant is merely suffering from declining production. Declining production is a reality of the industry which was undoubtedly taken into account by the Plaintiff. That is not the cause of McCulloch's present problems. Rather it is the inability to get return on invested capital.

DOE has also attempted to resist exception relief by making reference to McCulloch's present banks of costs which were not recovered in previous months. However, the impact of the NOPV may well eliminate the Plaintiff's banks, as would changes in the product markets. The testimony adduced at trial indicated that the posture of any business may change rapidly from day to day due to pricing changes in butane and natural gasoline. Thus, competitive firms would constantly be situated differently with respect to their available banks. It would therefore appear to be a highly speculative venture for the DOE or this Court to premise the denial of exception relief on a company's current bank of unrecovered costs.

It is also important to point out that the Belle Fourche plant is an economical supplier of propane to local residents in Western South Dakota, providing an assured wintertime source of that product. If the plant were reopened, it would, during the next three years, produce approximately 3.9 million gallons of NGLP's or enough butane to heat 1500 homes and ranches for that period of time. There is certainly no public interest served by compelling the plant's closure. Indeed, if it is not reopened, the NGLP's which could have been extracted will be lost.

The Court must conclude that in regard to the Belle Fourche plant, McCulloch may well be sustaining a serious hardship and that the Department must reevaluate the Plaintiff's application and provide such meaningful exception relief as is deemed necessary.

For all of the foregoing reasons judgment shall be entered declaring as arbitrary and capricious, lacking in substantial evidence and without rational basis those portions of the final Decisions and Orders issued on Administrative appeal on October 6, 1976, denying Plaintiff's application for exception relief for eight natural gas processing plants comprising cases FEA–0874 through FEA–0881 and issued on June 22, 1979, denying Plaintiff's application for exception relief for its Belle Fourche, South Dakota natural gas processing plant in Case RA 79–7. The Decision and Order is reversed and remanded to the Department of Energy with instructions to reopen the Plaintiff's request for exception relief, giving due consideration to McCulloch's actual return on invested capital, cash flow and net profitability and allow passthrough of increased depreciation expense incurred by the Plaintiff if it is determined that relief is required. Judgment shall also be entered declaring that the Subpart K revisions appearing at Title 10, Part 212.161, et seq., Code of Federal Regulations, regarding the definition of gas plants, depreciation expense, general and administrative expenses and interest expense are arbitrary and capricious, lacking in substantial evidence and without rational basis. The Defendant therefore is enjoined from enforcing those Subpart K revisions against the Plaintiff.

The motion for leave to intervene of the Federal Energy Regulatory Commission will be denied. This Court, more than nine (9) months ago begged, and implored FERC just to act within a time frame that would hasten the final determination of this case, but instead FERC took its own sweet time and reached its decisions several weeks after the trial of this case was set. We dare not contemplate what further delays FERC would impose upon the Court if allowed to intervene. Its application is tardy by many months. McCulloch's motion to reopen and supplement the record is also denied. This opinion shall constitute the Findings of Fact and Conclusions of Law of this Court.